**Virginia J. MARCH et al., Appellants,**

**v.**

**UNITED STATES of America.**

**Virginia J. MARCH et al.**

**v.**

**UNITED STATES of America,**
**Appellant.**

**Nos. 72–1816, 72–2062.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 1, 1973.

Decided Nov. 12, 1974.

Isaac N. Groner, Washington, D. C., with whom Alan Y. Cole and Charles R. Both, Washington, D. C., Earl C. Berger, Paris, France, were on the brief, for appellants in No. 72–1816 and appellees in No. 72–2062.

Edwin E. Huddleson, Atty., Dept. of Justice, with whom Harold H. Titus, Jr., U. S. Atty. at the time the brief was filed, and Walter H. Fleischer, Atty., Dept. of Justice, were on the brief, for appellants in No. 72–2062 and appellee in No. 72–1816. Morton Hollander, Atty., Dept. of Justice, and John A. Terry and James M. Hanny, Asst. U. S. Attys., also entered appearances for appellant in No. 72–2062 and appellee in No. 72–1816.

Before FAHY, Senior Circuit Judge, and ROBINSON and WILKEY, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

█ Virginia March and six other teachers brought this class action in the District Court to challenge the methods used by the Department of Defense in fixing basic salaries and other compensation for teachers employed in its Overseas Dependents Schools (ODS) system.[1] Briefly, the teachers allege that, in violation of the Overseas Teachers Pay and Personnel Practices Act,[2] the Department (1) computes annual salaries on the basis of the preceding year's wages, rather than the current year's wages, for similar teaching positions in the United States; (2) places teachers in lower salary steps than they would have been placed in comparable school districts in the United States; (3) limits credit for past teaching experience to two years; (4) makes no allowances for compensatory time; and (5) calculates the daily rate of compensation, for teachers paid on a daily basis, on a 210-day school year rather than the usual 180 or 190 days. The Department concedes that its computations are performed substantially as alleged by the teachers.

In particular, the teachers claim that these practices are inconsistent with Sections 4(a)(2) and 5(c) of the Act, which direct Department authorities to fix the "basic compensation for teachers and teaching positions at rates equal to the average of the range of rates of basic

1. The class comprises approximately 19,500 teachers employed after April 14, 1966 by the Department in its Overseas Dependents Schools. Jurisdiction in the District Court was invoked under the Tucker Act, 28 U.S.C. § 1346(a)(2) (1970), as a "civil action or claim against the United States, not exceeding $10,000 in amount, founded . . . upon [an] . . . Act of Congress. . . ." In a class action such as this, jurisdiction thereunder turns, not upon the aggregate amount of the claims the members of the class, but upon the amounts claimed indi-vidually by those members. Brown v. United States, 365 F.Supp. 328, 338 n. 5 (E.D.Pa. 1973); Northern Natural Gas Co. v. Grounds, 292 F.Supp. 619, 644 (D.Kan.1968), rev'd on other grounds, 441 F.2d 704, cert. denied, 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267 (1971). Cf. United States v. Louisville & Nashville R.R., 221 F.2d 698, 701 (6th Cir. 1955). No individual claim in this case exceeds $10,000.

2. Act of July 17, 1959, Pub.L. No. 86–91, 73 Stat. 213, 20 U.S.C. § 901 et seq. (1970).

compensation for similar positions of a comparable level of duties and responsibilities in urban school jurisdictions in the United States of 100,000 or more population." [3] The teachers asked for an injunction restraining the practices complained of, and for back pay assertedly due in accordance with the Act since April 14, 1966.[4]

There were no disputed issues of material fact, and the District Court disposed of the case on cross-motions for summary judgment.[5] The court granted *judgment for the teachers on only one of their claims, finding that the Department's policies of limiting credit for prior teaching experience to two years,* and of placing ODS teachers in lower steps than they would have been placed in domestic school districts of 100,000 or greater population, violated the Act. As to the rest of the issues, the court granted judgment for the Government, holding that computation of annual salaries on the basis of salaries in the preceding year was consistent with the Act, and that the remaining practices challenged were reasonable exercises of discretion. The court permanently enjoined the Government from refusing to place and compensate ODS teachers in the steps most closely comparable to those in which they would have been placed in school districts in the United States; [6] on motion

3. Section 4 of the Act, as amended, provides:

(a) Not later than the ninetieth day following July 17, 1959, the Secretary of Defense shall prescribe and issue regulations to carry out the purposes of this chapter. Such regulations shall govern—

(1) the establishment of teaching positions;

(2) the fixing of basic compensation for teachers and teaching positions at rates equal to the average of the range of rates of basic compensation for similar positions of a comparable level of duties and responsibilities in urban school jurisdictions in the United States of 100,000 or more population;

(3) the entitlement of teachers to compensation;

(4) the payment of compensation to teachers;

(5) the appointment of teachers;

(6) the conditions of employment of teachers;

(7) the length of the school year or school years applicable to teaching positions;

(8) the leave system for teachers;

(9) quarters, allowances, and additional compensation for teachers; and

(10) such other matters as may be relevant and appropriate to the purposes of this chapter.

(b) The regulations prescribed and issued by the Secretary of Defense under subsection (a) of this section shall become effective on such date as the Secretary of Defense shall prescribe but not later than the ninetieth day following the date of issuance of such regulations.

20 U.S.C. § 902 (1970). Section 5 of the Act, as amended, provides in pertinent part:

(a) The secretary of each military department in the Department of Defense shall conduct the employment and salary practices applicable to teachers and teaching positions in his military department in accordance with this chapter, other applicable law, and the regulations prescribed and issued by the Secretary of Defense under section 902 of this title. . . .

(b) Subject to section 203 of the Classification Act of 1949, the secretary of each military department—

(1) shall determine the applicability of paragraph (33) of section 202 of such Act, added by section 3 of this Act, to positions and individuals in his military department, and

(2) shall establish the appropriate annual salary rate in accordance with this chapter for each such position and individual to which such paragraph (33) is determined to be applicable. . . .

(c) The Secretary of each military department shall fix the basic compensation for teachers and teaching positions in his military department at rates equal to the average of the range of rates of basic compensation for similar positions of a comparable level of duties and responsibilities in urban school jurisdictions in the United States of 100,000 or more population. . . .

20 U.S.C. § 903 (1970).

4. This date is the effective date of an amendment to the Act, on which the teachers' case is based. See Part I(C), *infra.*

5. March v. United States, Civ. No. 3437-70 (D.D.C. May 31, 1972).

6. The Government argues that the District Court was without jurisdiction to grant injunctive relief. The court denied the claim for damages for back pay, and the decided cases, says the Government, suggest that equitable relief can be granted in a Tucker Act suit only in aid of a money judgment. See, *e. g.*, Blanc v. United States, 244 F.2d

by the Government, this injunction was stayed pending appeal to this court. The court denied the teachers' prayer for damages representing back pay.

The Government appeals from the judgment in favor of the teachers; the teachers appeal the District Court's determinations on the balance of the issues in favor of the Government. From our reading of the Act and related materials, discussed below, two factors stand clearly at odds with the District Court's disposition of certain issues adversely to the teachers—the unquestionably plain language of the statutory provisions central to the controversy, and the express congressional purpose of a 1966 amendment to the Act. We are thus constrained to reverse the court's judgment in part, affirm it in part, and remand the case for further proceedings.

## I. HISTORICAL BACKGROUND

### A. *The Period Prior to 1959*

Shortly after World War II, the United States established the Overseas Dependents Schools to provide educational facilities abroad for dependents of military and civilian personnel. The ODS system, we are told, is the ninth largest American school system, with over 180,000 students and approximately 7,000 teachers.[7]

Until 1959, ODS teachers were subject to the civil service laws and regulations. The application to ODS teachers of those general provisions, designed for federal civil servants who worked a regular twelve-month year,[8] created a number of economic inequities. Like stateside teachers, they worked the traditional nine- to ten-month school year. Unlike stateside teachers, however, they could not be paid during the summer months, or the Thanksgiving, Christmas or Easter recess periods,[9] nor could their salaries reflect "their academic background and qualifications, in accordance with the general practice in the United States."[10] As a result, the annual compensation of ODS teachers was substantially below that of their stateside counterparts. Congress sought to correct this situation by enactment in 1959 of legislation specifically addressing the Department's practices respecting overseas teachers.

### B. *The 1959 Overseas Teachers Pay and Personnel Practices Act*

The Senate report accompanying the bill that became the Act stated that the purpose of the bill was

> to provide a system of personnel administration for schoolteachers and certain school officers and other employees of the dependents schools operated by the Department of Defense in oversea areas comparable to the systems found in the majority of the public primary and secondary school jurisdictions in the United States.
>
> The proposed system recognizes and corrects deficiencies in the present system which the Department of Defense has identified and which long have been apparent.[11]

To remedy the deficiencies in compensation we have noted, the Act originally provided that ODS teachers were to be paid "in relation to the rates of basic compensation for similar positions in the United States."[12] The Department, pursuant to the Act, promulgated regulations to "conduct the employment and salary practices applicable to teachers

---

708, 709 (2d Cir.), cert. denied, 355 U.S. 874, 78 S.Ct. 126, 2 L.Ed.2d 79 (1957). Since we hold that the District Court erred in rejecting the teachers' prayer for damages, we find it unnecessary to reach that issue. See Part IV, *infra.*

7. Brief for United States at 4; Brief for Teachers at 4.

8. See S.Rep.No.141, 86th Cong., 1st Sess. 2 (1959).

9. *Id.* See also H.R.Rep.No.357, 86th Cong., 1st Sess. 2–3 (1959).

10. S.Rep.No.141, 86th Cong., 1st Sess. 2 (1959).

11. *Id.* at 1.

12. Act of July 17, 1959, Pub.L. No. 86–91, § 5(c), 73 Stat. 214 (1959).

and teaching positions . . . in accordance with [the] Act . . .." [13] The only specific standard in the Act to guide the Department was a provision that the basic compensation for ODS teachers could not exceed the highest rate of basic compensation for public school teachers in the District of Columbia. [14]

In addition to the published regulations, the Department established two procedures that cemented the ODS teachers' annual wage rate considerably below that paid to stateside teachers. First, since Congress had limited appropriations for ODS to a specific amount per student, the Department interpreted the "in relation to" language of the Act as limiting the teachers' salaries by this "per pupil limitation." [15] Second, because Bureau of the Budget regulations prohibited federal agencies from budgeting for anticipated increases in wages or salaries based on prevailing rates outside the Federal Government, [16] the Department calculated the teachers' annual salaries by the preceding year's rate. The former policy has been discontinued, but the latter is still a key element of the Department's computation scheme. [17]

The teachers challenged the Department's interpretation, arguing that the Act required it "to take periodic action

to raise [the teachers'] salaries to levels equal to those prevailing in the United States . . .." [18] The Department answered that it was restricted by the per pupil limitation. This dispute resulted in a series of legal battles in which the courts uniformly upheld the Department's construction and its related practices. [19] The historical posture of the case at bar was significantly altered, however, in 1966 when Congress again tried to bring ODS teachers' pay in line with salaries for teaching in comparable school districts in the United States.

## C. The 1966 Amendment

In 1965, two congressional subcommittees held hearings, on a proposed amendment to the Act, that clearly and indisputably showed that ODS teachers were not receiving the compensation Congress had intended to provide. [20] In fact, in some respects the teachers had fared worse under the Act than they would have under the civil service laws and regulations. [21] The House Committee on Post Office and Civil Service reported:

The Post Office and Civil Service Committee and the Congress understood that in enacting [the Act] they were providing a firm and reasonable formula for the payment of appropri-

13. Act of July 17, 1959, Pub.L. No. 86–91, § 5(a), 73 Stat. 214 (1959).

14. Act of July 17, 1959, Pub.L. No. 86–91, § 5(c), 73 Stat. 214 (1959).

15. See H.R.Rep.No.519, 89th Cong., 1st Sess. 3 (1965).

16. See Instructions for the Preparation and Submission of Annual Budget Estimates, Bureau of the Budget Circular A–11, § 13.4 (July, 1963).

17. The legality of this practice is considered in Part III(A), infra.

18. See Mitchell v. McNamara, 122 U.S.App. D.C. 224, 225, 352 F.2d 700, 701 (1965).

19. Mitchell v. McNamara, supra note 18; Crawford v. United States, 179 U.S.App. D.C. 128, 376 F.2d 266 (1967), cert. denied, 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968); Chambers v. United States, 306 F. Supp. 317 (E.D.Va.1969), aff'd, 434 F.2d 1312 (4th Cir. 1970), cert. denied, 402 U.S.

944, 91 S.Ct. 1619, 29 L.Ed.2d 113 (1971). These cases construed the text of the original Act, rather than the 1966 amendment. See also note 37, infra.

20. See Hearings on H.R. 6845 Before the Subcomm. on Compensation of the House Comm. on Post Office and Civil Service, 89th Cong., 1st Sess. (1965); Hearings on S. 2228 Before the Subcomm. on Civil Service of the Senate Comm. on Post Office and Civil Service, 89th Cong., 1st Sess. (1965). Both bills were firm in their intent to remedy the inequities noted in the text.

21. "The salaries of [ODS] teachers have suffered. Since 1959 their salaries have been increased twice, by a total percentage of 4.3. During the same period, salaries for employees classified as GS–7 (the classification which these teachers had prior to 1959), have increased 21.5 percent, and teachers [sic] salaries in school jurisdictions of 100,000 or more have increased by 18.5 percent." S.Rep. No.951, 89th Cong., 2nd Sess. 3 (1966).

ate salaries to overseas teachers. That understanding has not proved out. [The proposed amendment] provides a standard which, although variable in amount, is positive because the precise dollar amounts in question are readily ascertainable. . . . The bill then goes on to direct and require that the overseas teachers *shall* be paid salaries determined by the standard.[22]

The Committee further enunciated the purpose of the proposed amendment:

[T]o establish a positive, reasonable, and fully effective legislative policy with respect to rates of compensation which shall be paid to teachers in the overseas dependents school system of the Department of Defense, under which policy the Department of Defense and the three military departments shall and must pay such teachers salary rates equal to the average range of salaries paid teachers having comparable levels of duties and responsibilities in urban school jurisdictions in the United States of 100,000 or more population. *This policy, and the mandatory payment of such equal salary rates, is consistent with, and will strengthen, the policy laid down by the Congress in the enactment of the Defense Department's Overseas Teachers Pay and Personnel Practices Act (Public Law 86–91), which thus far has not been effectuated in accordance with congressional intent.*[23]

The amendment, enacted in 1966, provided that ODS teachers were no longer to be paid "in relation to the rates of basic compensation for similar positions in the United States"; [24] rather, they

were to receive salaries "equal to" those of a defined class of teachers.[25] Congress thus delineated a compensatory scheme for ODS teachers that would put them on a par with stateside teachers. Perhaps Congress also hoped to end the perennial feud between the Defense Department and its corps of educators but, as this case illustrates, the dispute is still very much alive.

In our view, as discussed below, the clear purpose of the 1966 amendment was to guarantee ODS teachers the same salaries they would receive for performing the same duties in stateside schools. Indeed, it is difficult to read the Act any other way.

## II. ELUCIDATING THE ACT

 When a court construes a statute, the starting point must be the language of the statute.[26] We have carefully examined the Overseas Teachers Pay and Personnel Practices Act and conclude that basic compensation for ODS teachers is to be calculated on a parity with basic compensation for teachers in the United States. It is well settled that "[w]here the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion." [27]

 To be sure, as the Government argues, this "plain meaning rule" does not "preclude consideration of persuasive evidence if it exists." [28] The Supreme Court has warned that

words are inexact tools at best and for that reason there is wisely no rule of

---

22. H.R.Rep.No.519, 89th Cong., 1st Sess. 4 (1965) (emphasis in original).

23. *Id.* at 2 (emphasis added).

24. See text *supra* at note 12.

25. See note 3, *supra.*

26. United States v. Bass, 404 U.S. 336, 339, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) ; Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ; Zaimi v. United States, 155 U.S.App.D.C. 66, 71, 476 F.2d 511, 516 (1973).

27. Caminetti v. United States, *supra* note 26, 242 U.S. at 485, 37 S.Ct. at 194. See also Callanan v. United States, 364 U.S. 587, 594–595 (1961) ; United States v. Public Utils. Comm'n, 345 U.S. 295, 312–313, 73 S.Ct. 706, 97 L.Ed. 1020 (1953) ; Sea-Land Serv., Inc. v. FMC, 131 U.S.App.D.C. 246, 248–249, 404 F.2d 824, 826–827 (1968) ; District of Columbia Nat'l Bank v. District of Columbia, 121 U.S.App.D.C. 196, 198, 348 F.2d 808, 810 (1965).

28. Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928).

law forbidding resort to explanatory legislative history no matter how "clear the words may appear on 'superficial examination.' "[29]

In our opinion, this admonition merely underscores the importance of construing this statute, if possible, to give effect to the congressional purpose. The Government has briefed in great detail the legislative history of the 1966 amendment and argues that it establishes that the Defense Department's interpretation is consistent with the "congressional understanding." The teachers, although they rely primarily on the plain meaning of the Act, have also briefed the legislative history in no less exhausting detail and argue that it fully supports their construction.

■■■ The strong support that the Government and the teachers respectively find in the hearings [30] and congressional debates [31] reinforces our conviction that this aspect of the legislative history is at most ambiguous and contradictory,[32] and therefore should be ignored in favor of an application of the clear and precise statutory language and purpose here involved. Indeed, "this is a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute."[33]

The Government also argues that the congressional reports establish the validity of the Department's application of the Act. We disagree. The reports dem-

29. Harrison v. Northern Trust Co., 317 U.S. 476, 479, 63 S.Ct. 361, 363, 87 L.Ed. 407 (1943), quoting United States v. American Trucking Ass'n, 310 U.S. 534, 544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

30. "The individual opinions of witnesses at hearings are of dubious value in interpretation of legislation." Potomac Passengers Ass'n v. Chesapeake & Ohio Ry. Co., 154 U.S.App. D.C. 214, 225, 475 F.2d 325, 336 (1973), citing McCaughn v. Hershey Chocolate Co., 283 U.S. 488, 493, 51 S.Ct. 510, 75 L.Ed. 1183 (1931); Pacific Ins. Co. v. United States, 188 F.2d 571, 572 (9th Cir.), cert. dismissed, 342 U.S. 857, 72 S.Ct. 85, 96 L.Ed. 645 (1951); United States v. Kung Chen Fur Corp., 188 F.2d 577, 584, 38 CCPA 107 (1951); Railroad Retirement Board v. Duquesne Warehouse Co., 80 U.S.App.D.C. 119, 122, 149 F.2d 507, 510 (1945), aff'd, 326 U.S. 446, 66 S.Ct. 238, 90 L.Ed. 192 (1946).

31. It is of course undisputed that courts can consider congressional debates in construing legislation. See United States v. O'Brian, 391 U.S. 367, 383–384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). But where, as here, they reflect individual interpretations that are contradictory and ambiguous, they carry no probative weight. See, e. g., NLRB v. Plasterers' Local Union, 404 U.S. 116, 129–130 n. 24, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971).

32. See generally hearings cited *supra* note 25; 111 Cong.Rec. 19223–42 (1965). As one example, the Government relies on a statement by Representative Udall, a sponsor of the 1966 amendment, that claimed the practice of calculating ODS teachers' salaries on the basis of the preceding year's salaries for stateside teachers was consistent with Bureau of the Budget regulations.

The salary-determination procedures of [the proposed amendment] are intended to require that the salary scheduled for a particular school year will be set in consideration of rates paid in school jurisdictions in the United States for the preceding school year. This is necessary because the Department of Defense budget must be prepared during the preceding year when salary schedules in the United States for the coming school year cannot be determined. Under Bureau of the Budget regulations, departments may not budget for anticipated increases in wages or salaries based on prevailing rates outside of the Federal Government. Only wage or salary schedules based on wages or salaries actually being paid can be considered.

111 Cong.Rec. 19234 (1965). The teachers counter with statements by Representative Udall, 111 Cong.Rec. 19234, 19237, 19239 (1965), and other congressmen. *Id.* at 19235 (remarks of Representative Stratton); *id.* at 19239 (remarks of Representative Broyhill). The teachers also point out that Representative Udall joined in a 1969 committee report that criticized Department practices. H.R. Rep.No.91–480, 91st Cong., 1st Sess. 7 (1969). See Bobsee Corp. v. United States, 411 F.2d 231, 237 n. 18 (5th Cir. 1969). We note that this report, although written after passage of the 1966 amendment, was prepared by the same committee that pledged "a continuing review" to be certain that ODS teachers were paid their proper salaries. H.R. Rep.No.519, 89th Cong., 1st Sess. 4 (1965).

33. Greenwood v. United States, 350 U.S. 366, 374, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956). *Cf.* F. Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 543 (1947).

onstrate a congressional intent consistent with the unequivocal statutory language,[34] which we find in some respects inconsistent with the current application of the Act.[35]

Recognizing the clarity with which Congress has expressed itself, we must determine whether present compensatory practices are consistent with the statute and the purpose it was enacted to carry out. Our duty in this regard, to paraphrase the Supreme Court,[36] is to place the statute and current practice side by side and see if the latter squares with the former.

## III. TESTING THE DEPARTMENT'S COMPENSATORY PRACTICES AGAINST THE STATUTORY LANGUAGE

### A. *Computation of Salaries Based on the Preceding Year's Rate*

■■ The Defense Department calculates the teachers' current annual salaries by using the preceding year's salaries for stateside teachers of the class defined by the Act. We hold that this practice violates the statutory mandate that ODS teachers are to be compensated "at rates *equal to* the average of the range of rates of basic compensation for similar positions of a comparable level of duties and responsibilities in urban school jurisdictions in the United States of 100,000 or more population." [37]

■ As the Government points out, the statutory language does not expressly designate the stateside salary year to be utilized in applications of the statutory formula. It is well settled, however, that words in a statute will be read according to their common usage, absent a contrary indication.[38] Surely the term "equal to," as it is commonly used and understood, means equivalent to a present component, rather than past or future. If Congress had intended to key ODS teachers' salaries to the preceding

---

34. See Part I(C), *supra.* Citations of the reports herein are not meant to supplant the court in its interpretative function. See United States v. American Trucking Ass'n, *supra* note 29, 310 U.S. at 544, 60 S.Ct. 1059. Our references to the reports are simply "for the purpose of ascertaining the general object of the legislation proposed, and the mischiefs sought to be remedied." FTC v. Raladam Co., 283 U.S. 643, 651, 51 S.Ct. 587, 591, 75 L.Ed. 1324 (1931). "A committee report represents the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." Zuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 324, 24 L.Ed.2d 345 (1969); United States v. O'Brian, *supra* note 31, 391 U.S. at 385, 88 S.Ct. 1673; United States v. UAW Int'l, 352 U.S. 567, 585, 77 S.Ct. 529, 1 L.Ed. 2d 563 (1957).

35. See Part III, *infra.*

36. United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936).

37. 20 U.S.C. §§ 902(a)(2), 903(c) (1970) (emphasis added), quoted in full *supra* note 3.
The Court of Claims reached the opposite conclusion in another case challenging this practice and seeking back pay. Trecosta v. United States, 194 Ct.Cl. 1025 (1971). The Court reasoned that "[a]lthough Congress was fully cognizant of past Department procedure . . . , no action was taken and no change contemplated." *Id.* at 1026. We are compelled to reach a different result. We agree

that where an administrative agency has consistently given a statute an interpretation over a long time and Congress reenacts the statute without change, Congress might be presumed to have adopted the agency's construction of the statute. Commissioner v. Flowers, 326 U.S. 465, 469, 66 S.Ct. 250, 90 L.Ed. 203 (1946); United States v. Cerecedo Hermanos y. Compania, 209 U.S. 337, 339, 28 S.Ct. 532, 52 L.Ed. 821 (1908). This maxim, however, is not the last word; the Supreme Court has admonished that reenactment "is an unreliable indicium at best" to indicate "congressional satisfaction" with a statutory interpretation. Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431, 75 S.Ct. 473, 477, 99 L.Ed. 483 (1955). We believe that where, as here, "the law is plain the subsequent re-enactment of a statute does not constitute adoption of its administrative construction." Biddle v. Commissioner, 302 U.S. 573, 582, 58 S.Ct. 379, 383, 82 L.Ed. 431 (1938), citing Iselin v. United States, 270 U.S. 245, 46 S.Ct. 248, 70 L.Ed. 566 (1926); Louisville & N. R. Co. v. United States, 282 U.S. 740, 51 S.Ct. 297, 75 L.Ed. 672 (1931); Helvering v. New York Trust Co., 292 U.S. 455, 467–468, 54 S.Ct. 806, 78 L.Ed. 1361 (1934).

38. Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966); Commissioner v. Brown, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965); Williams v. W.M.A. Transit Co., 153 U.S.App.D.C. 183, 190, 472 F.2d 1258, 1265 (1972).

year's salaries for stateside teachers, it could easily have specified such a standard.[39] Here Congress used the phrase "equal to" without qualification and, lacking manifestation of a different intent, we think temporal as well as monetary equality was contemplated.

We are no more impressed by the Government's assertion that the Department's interpretation of the Act should be accepted because it was adopted by the agency charged with principal responsibility for administering the Act.[40] We note initially that administrative construction of the statutory language under scrutiny in no way drew upon the experience or expertise of the Defense Department. The interpretative problem before the Department was the meaning of statutory language pertinent to a matter completely outside its field of specialty, but well within the area entrusted to the courts.[41] "Administrative construction is less potent than it otherwise would be where it does not rest upon matters peculiarly within the administrator's field of expertise." [42]

Moreover, the Department's interpretation could hardly lay claim to the presumption of accuracy that courts frequently accord to an ageny's construction of a law it is legislatively empowered to oversee.[43] When it enacted the 1966 amendment, Congress made known its displeasure with the Department's failure to carry out the purpose underlying the Act in original form; indeed, the amendment was a direct response to that failure. The House Report accompanying the bill that eventuated as the 1966 amendment stated:

> The Committee on Post Office and Civil Service is deeply concerned at the treatment that has been accorded the overseas school teachers—a concern shared, it is believed, by many other Members of Congress—particularly in view of *the obvious failure to administer the salary provisions of [the original Act] as they were intended and expected by the committee and the Congress to be administered.* Without attempting to place the blame, and whether it be due to administrative unwillingness to shoulder the burden of obtaining necessary funds or disagreement with the policies of [the original Act], it certainly is essential that the problem be resolved without further delay.[44]

It is clear enough to us that here "the legislature itself has responded to [the Department's] past interpretation and administration of the legislation with severe censure," [45] and that "[t]he general presumption that the agency has correctly discerned and implemented the intent of the legislature[] would seem singularly inappropriate." [46]

Perhaps even more importantly, "[j]udicial obeisance to administrative action cannot be pressed so far" as to justify adoption of an administrative construction that "flies in the face of the purposes of the statute and the plain meaning of its words." [47] To accept the

---

39. See, e. g., Davies Warehouse Co. v. Bowles, 321 U.S. 144, 156, 64 S.Ct. 474, 88 L.Ed. 635 (1944).

40. See, e. g., Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) ; Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) ; Lenkin v. District of Columbia, 149 U.S.App.D.C. 129, 141, 461 F.2d 1215, 1227 (1972).

41. See Barlow v. Collins, 397 U.S. 159, 166, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

42. Thompson v. Clifford, 132 U.S.App.D.C. 351, 364, 408 F.2d 154, 167 (1968).

43. See note 40, *supra,* and accompanying text.

44. H.R.Rep.No.519, 89th Cong., 1st Sess. 3–4 (1965) (emphasis added). See text *supra* at note 23.

45. Cy Ellis Raw Bar v. District of Columbia Redevelopment Land Agency, 139 U.S.App. D.C. 385, 390, 433 F.2d 543, 548 (1970).

46. *Id.*

47. Haggar Co. v. Helvering, 308 U.S. 389, 398, 60 S.Ct. 337, 341, 84 L.Ed. 340 (1940). See also Thompson v. Clifford, *supra* note 42, 132 U.S.App.D.C. at 363, 408 F.2d at 166; District of Columbia v. Grimes, 131 U.S.App.D.C. 360, 362, 404 F.2d 1337, 1339 (1968).

Department's interpretation respecting the stateside salary year on which ODS teachers' salaries are to be computed would be to foresake the unmistakable mission of the Act. We recognize that there is some authority for the Government's position in the congressional debates and hearings but, on the whole, this aspect of the legislative history is far from conclusive.[48] We find the Act and the committee reports clear and unequivocal as to the intent of Congress,[49] and our duty is to give that intent full effect.

### B. *Salary Grades, Steps and Prior Teaching Experience*

 Salaries in both the ODS and the stateside systems are classified by grades and, within each grade, are graduated by steps corresponding to prescribed qualifications and experience. In placing teachers at particular levels the Defense Department limits credit for prior teaching experience to two years, regardless of the quantum of actual prior experience. The teachers also allege that the Department limited the number of steps and assigned lower values to each step in violation of the Act.

The teachers claim that the "equal to" language of the statute [50] applies to all elements of the teachers' compensation and prohibits current Department procedures. The Government responds that many of these practices are not subject to the "equal to" standard, but rather are committed to the Department's discretion by other provisions.[51] Although we do not agree with the teachers' position that all facets of their compensation are subject to the requirement of equality with stateside teachers,[52] we do think salary grade, steps and credit for past teaching experience are essential ingredients of "basic compensation," and

therefore are covered by the "equal to" mandate of the Act.

 Again, the focal point of the controversy is the meaning of the statutory language—"at rates equal to the average of the range of rates of basic compensation for similar positions of a comparable level of duties and responsibilities in urban school jurisdictions in the United States of 100,000 or more population." [53] The Act undisputably obligates the Department to determine the *"average of the range of rates"* in the school districts specified. Once the average in those districts is determined, we think salary grades and steps for ODS teachers—which in the final analysis determine their basic annual wage—must match this average grade by grade and step by step. The House report makes this meaning clear:

> The effect of the reported bill . . . is to *require* that salaries paid teachers in the Department of Defense Overseas Dependents School System be *equal* to the average of the minimum, intermediate and maximum rates paid teachers holding positions of comparable levels of responsibility in urban school jurisdictions of 100,000 or more population in the United States, including the same average number of salary steps.[54]

This language echoes the plain import of the statutory language, which, as Congress intended, leaves "no room for the substitution of independent views or judgments by any Federal civilian or military official." [55] The Act thus requires the Department to give ODS teachers credit for prior experience on the same basis that such credit is accorded teachers in the specified stateside districts. Beyond that, the number of steps, the value of each step and the qualifications therefor must, as closely

---

48. See note 32, *supra*.

49. See Part I(C), *supra*.

50. 20 U.S.C. §§ 902(a)(3), 903(c) (1970), quoted *supra* note 3.

51. See 20 U.S.C. § 902(a)(1), (3)–(10) (1970), quoted *supra* note 3.

52. See Part III(D), *infra*.

53. See note 3, *supra*.

54. H.R.Rep.No.519, 89th Cong., 1st Sess. 3 (1965) (emphasis in original).

55. *Id.* at 4.

as practicable, equal the average for the specified districts.

■ The Government argues that the Department's practices with respect to these matters are incidental, and therefore within its discretion.[56] It also states that its "practice for crediting past teaching experience is part of a system 'designed to produce a reasonable, simple, and understandable compensation program.'"[57] Unless "basic compensation" is a term of art in the education field, for which no evidence is presented to us, this argument is unpersuasive. The Government would apparently have us believe that ODS teachers have only passing interest in their initial salary grades and steps, but we cannot accept this proposition. No more for overseas teachers than for administrative bureaucrats can we imagine a view that qualifications for federal grade levels and steps are just "incidental" to basic salaries.[58]

■ Perhaps the Defense Department has constructed a simple and easily

administered compensation program for ODS teachers, but neither fondness for simplicity nor an unwarranted interpretation of "basic compensation" can be permitted to frustrate the ordinary and natural meaning of the statutory language[59] and the manifest purpose of Congress to place ODS teachers on a par with their stateside counterparts.[60] We hold that the Department's construction of the Act in the respects discussed is clearly at odds with the intent behind the 1966 amendment.

## C. Daily Rates of Compensation

■ The teachers also challenge the Department's practice of computing daily rates of compensation on the basis of a school year of 210 days rather than the normal school year of 180 to 190 days.[61] The Government argues that this procedure falls within the discretion of the Defense Department under Section 4(a)(7)[62] to prescribe regulations governing "the length of the school year

56. We are mindful of the Government's position that the practices in question are covered by the provisions of 20 U.S.C. § 902(a)(1), (3)–(10). See note 3, *supra*. Undoubtedly, those provisions give the Department some discretion in determining certain conditions of ODS teachers' employment, but its discretion, as it pertains to fixing basic compensation, is plainly limited by the mandate of equality in 20 U.S.C. §§ 902(a)(2), 903(c). See note 3, *supra*. We must read the Act as a whole, and give effect to each of its provisions if possible, "in light of the legislative policy and purpose." Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 631–632, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973). Our interpretation, we think, firmly embraces both of these principles. To accept the Department's interpretation, however, would be to strike a crippling blow to the statutory scheme of equality, and to neutralize the obvious objective of the 1966 amendment. An administrative agency, like a court, lacks freedom to tailor its interpretation of a statute to its own notions of what is best, and thereby to negate its stated purpose. State Dep't of Social Serv. v. Dublino, 413 U.S. 405, 419–420, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973).

57. Brief for Government at 20–21.

58. The importance of the limit on credit for prior experience, for example, can be clearly

shown. A teacher with a Bachelor of Arts degree and six years of prior teaching experience would have been placed at step 7 in a stateside school system during the 1969–70 school year; but the Department would have placed the same teacher at step 3 in an overseas position. Joint App. at 27 (affidavit of Earl C. Berger, Counsel for the Overseas Education Association). At that time, each step was worth $270, resulting in a loss of $1,080, which was exacerbated by use of the salary scale from the preceding year. See Part III(A), *supra*.

59. See note 38, *supra*, and accompanying text.

60. See Part I(C), *supra*.

61. The discrepancy results because the Department includes the Christmas and Easter vacations as part of the school year for this purpose, while stateside schools exclude these days. In each case, the school year comprises between 180 and 190 working days. See 5 C.F.R. § 1601.7 (1974).

62. The Government also argues that the discretion given by Section 4(a)(9), 20 U.S.C. § 902(a)(9) (1970), to promulgate regulations governing "quarters, allowances, and additional compensation for teachers," allows the Department to fix the year at 210 days for calculation of the daily wage rate. We cannot agree that this provision is relevant to this

or school years applicable to teaching positions." [63]

This provision certainly confers discretion in determining the length of the school year [64] but, with equal certainty, that discretion must be exercised in a reasonable manner [65] and consistently with congressional expressions in the statute.[66] The Department's present method of computing the daily rate does not comport with these criteria.

Current departmental regulations provide that the school year for ODS teachers "will consist of not more than 190 working days." [67] In computing ODS teachers' daily rate of compensation, however, the Department uses a 210-day school year, derived from the number of calendar days in the school year, excluding Saturdays and Sundays but including Christmas and Easter recesses. There is no evidence in the record to indicate that this method of calculation has ever been used in any of the school districts referred to in the Act.

 We think this practice is condemned by the requirement of equality defined in the Act, because the daily wage rate is an integral part of "basic compensation." [68] All elements of basic

compensation are governed by the statutory equality mandate, and the manifest purpose of the Act is to put ODS teachers and teachers in the United States on the same plane.[69] It is our understanding that stateside districts predicate all computations on actual working days—between 180 and 190 per year—and the Act requires the same of the Department.

### D. Compensatory Time

 The teachers also complain that the Department's regulations do not provide for allowances of compensatory time in the ODS system, while such allowances exist in similar positions in stateside schools. It may be that stateside teachers accumulate compensatory time for such activities as attending PTA meetings, lesson preparation and grading papers. We hold, however, that these aspects of compensation are not part of "basic compensation" under Sections 4 (a)(2) and 5(c),[70] but rather are committed to the Department's discretion under Sections 4(a)(8) and 4(a)(9) dealing with "the leave system" and "additional compensation." [71] Accordingly, this aspect of the District Court's judgment will not be disturbed.

case. The first two categories in this section certainly do not apply. See 20 U.S.C. §§ 905, 906 (1970). Moreover, "additional compensation," as it is commonly understood, does not include computation of the daily wage rate, because that rate is merely a breakdown of the basic annual wage. Compare Part III(D), *infra*.

63. 20 U.S.C. § 902(a)(7) (1970).

64. Indeed, the Department might reasonably provide that the school year for ODS teachers consists of more than 190 working days. Once the number of working days is fixed, however, we think the statute requires the Department to fix the daily rate in the same manner as stateside schools. A major purpose both of the original Act and the 1966 amendment was to equalize ODS teachers' compensation and stateside teachers' salaries. See Part I, *supra*. The Government has not pointed to a single stateside jurisdiction that computes its daily pay rate in the fashion we are asked to approve. Thus we cannot infer that there is a basis for claiming that the

current practice represents that in the average stateside school district.

65. *E. g.*, Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413–414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

66. *E. g.*, Hardin v. Kentucky Util. Co., 390 U.S. 1, 8, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968).

67. 5 C.F.R. § 1601.7 (1974).

68. See note 62, *supra*.

69. See Part I(C), *supra*.

70. 20 U.S.C. §§ 902(a)(2), 903(c) (1970), quoted *supra* note 3.

71. 20 U.S.C. § 902(a)(8), (9) (1970), quoted *supra* note 3. The teachers have not presented any evidence to contradict the District Court's finding that the Department's discretion has been "reasonably exercised." Instead, they argue that this part of the case is also subject to the strict equality standard discussed above. See Parts III(A), (B) & (C), *supra*. We think this argument ignores the ordinary meaning of the statutory language.

## IV. THE TEACHERS' RIGHT TO DAMAGES

■ As we noted above,[72] the District Court found the Department's practices inconsistent with the statutory scheme in one respect. The court granted the teachers injunctive relief on that count,[73] but denied their claim for back pay damages.

The trial court gave no reason for denying the teachers' prayer for damages, and we are unable to discern any sound reason to support the denial. The teachers had a statutory right to receive the pay they now demand as damages.[74] As a direct result of the Department's erroneous interpretation and application of the Act, they have suffered a recognizable legal injury. In addition to an injunction against the condemned practices, they should receive what has been rightfully and legally theirs since April 14, 1966.[75] As the Supreme Court has declared, "[a] disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied." [76]

## V. CONCLUSION

The results we reach today are required by the language and purpose of the Act. Congress has twice tried to equalize the salaries of ODS and stateside teachers; the disparity in salaries has also been expressly condemned in committee reports. The basic compensation of ODS teachers, however, is still significantly below that of stateside teachers. We hope this decision will finally resolve a dispute that has already lasted far too long.

For the reasons stated in this opinion, we affirm the judgment granted in favor of the teachers. The judgment for the Government is reversed as to the calculation of salaries based on the preceding year, the computation of daily rates based on a 210-day year and the denial of damages. The balance of the judgment of the District Court is affirmed. The case is remanded to the District Court for further proceedings consistent with this opinion.

So ordered.

72. See text *supra* at note 5.

73. See text *supra* at note 6.

74. See Part III, *supra*. Moreover, none of the usual justifications for barring retroactive application of a judicial decision apply to this case. See Linkeletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961); Comment, Legal Aspects of the Use of "Ordinary Simple Interest," 41 U.Chi.L.Rev. 141, 150–51 (1972).

75. See notes 1 & 4, *supra*.

76. Texas & Pac. Ry. Co. v. Rigsby, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916). See also Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 239, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); Kentucky Util. Co. v. TVA, 375 F.2d 403, 416–417 (6th Cir. 1966); Dann v. Studebaker-Packard Corp., 288 F.2d 201, 208–209 (6th Cir. 1961). There has been no suggestion that the named teachers, and those whom they represent, are not members of the class for whose benefit the statute was enacted.