762 F.2d 762
 53 USLW 2631
 CHULA VISTA CITY SCHOOL DISTRICT, Plaintiff/Appellee,
v.
T.H. BELL, United States Secretary of Education,
Defendant/Appellant.
CHULA VISTA CITY SCHOOL DISTRICT, Plaintiff/Appellant,
v.
T.H. BELL, United States Secretary of Education, Defendant/Appellee.
 Nos. 83-5627, 83-5631.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 5, 1984.
Decided June 4, 1985.
 
 Donald Jay Solomon, Leonard W. Pollard, II, San Diego, Cal., for Chula Vista City School Dist.
 Howard S. Scher, Dept. of Justice, Washington, D.C., for T.H. Bell.
 On appeal from the United States District Court for the Southern District of California.
 Before WALLACE, BOOCHEVER and HALL, Circuit Judges.
 BOOCHEVER, Circuit Judge:
 
 
 1
 At issue is the validity of a rule used by the Secretary of Education in determining the amount granted to local school districts by the federal government to compensate them for the burden of educating children who live on federal property that the districts cannot tax. We uphold the Secretary's rule.
 
 BACKGROUND
 
 2
 Most school districts and local education agencies (LEA's) are funded by a tax on the value of real property within their boundaries. States and their subdivisions, however, may not tax property owned by the federal government. See generally H.R.Rep. No. 2287, 81st Cong., 2d Sess. 1-2 (1950) [hereinafter cited as House Report]. To mitigate various burdens placed on school districts by federal ownership, Congress enacted the Act of Sept. 30, 1950, ch. 1124, 64 Stat. 1100 (codified as amended at 20 U.S.C. Secs. 236-241ff (1982 & Supp. I 1983)) (the "Impact Aid law" or the "statute"). At the center of this controversy is 20 U.S.C. Sec. 238 which addresses specifically LEA's, such as the plaintiffs, which must educate children whose parents live or work on nontaxable federal property. The section provides that for each such child an LEA shall receive an amount which is based on the amount spent from local revenues per child in "generally comparable" school districts. 20 U.S.C. Sec. 238(d)(3)(A). The statute leaves the determination of comparability to the Secretary, who has promulgated regulations therefor. See 34 C.F.R. pt. 222 (1984) (previously codified at 45 C.F.R. pt. 115). Two methods are presently used to make this determination. Under the one used in California, a district selects approximately five other districts in the state which it believes are generally comparable to itself. The selections are subject to the Secretary's disapproval. See 20 U.S.C. Sec. 238(d)(3)(A); 34 C.F.R. Secs. 222.30-.32 (1984).
 
 
 3
 Since he began to administer the statute in 1950, the Secretary has employed the "$50 Rule" (the Rule) disputed here. If the average local contribution of the five selected districts is more than $50 in excess of the local contribution per non-federally-connected child in the subject district, they are not considered comparable. In effect, the rule awards for each federally-connected child approximately the amount a district raises locally for its non-federally-connected children.
 
 
 4
 In addition to the $50 Rule, the Secretary's regulations require that the allegedly comparable districts be similar to the applicant district upon at least five of fourteen criteria in a "grid" comprising legal classification, total average daily attendance, total cost per pupil, cost per pupil paid from local sources, grade levels maintained, percent of pupils transported, pupil-teacher ratio, assessed valuation per pupil, ratio of assessed value to true value, tax rate for all school purposes, tax rate for current expenses, curricula offered, teachers' salaries, and economic characteristics.
 
 
 5
 Eight districts, which had previously filed applications conforming to the regulations, amended and resubmitted them when they learned the Department had decided as an experimental policy not to enforce the $50 Rule. In May and June of 1979 analysts in the Department of Education approved the eight applications, employing the grid but not requiring adherence to the Rule. In those applications, the applicants designated as "generally comparable," districts which were similar on at least five of the grid's criteria but whose local contributions far exceeded those of the applicant. For example, class representative Chula Vista's local contribution in the year used for purposes of comparison was $467 while those of the districts named in its application averaged $1,473.
 
 
 6
 In July the Director of the Division of School Assistance in Federally Affected Areas (DSAFA) decided to deny the applications on the ground, inter alia, that they did not comply with the Department's regulations.
 
 
 7
 The school district challenged the denial. The Administrative Law Judge held that the $50 Rule was consistent with the statute and the regulations and that it was not required by the General Education Provisions Act (GEPA), 20 U.S.C. Secs. 1221-1234e (1982 & Supp. I 1983), to be published before promulgation. The Secretary declined to review this decision and plaintiffs appealed.
 
 
 8
 On cross motions for summary judgment, the district court reversed, holding that the $50 Rule was inconsistent with the legislative intent of the statute. The court agreed, however, that GEPA was not violated by the Department's failure to publish the rule. The court ordered the Secretary to review the amended applications whose approval had been rescinded by the Director of DSAFA and to award applicants amounts equivalent to the local contributions of the allegedly comparable districts if those districts were similar to the applicants on the first and fourth grid criteria and any three of the other twelve.
 
 I. Jurisdiction
 
 9
 Although we ordinarily will not consider issues which were not raised below, we must inquire sua sponte whether the district court had subject matter jurisdiction of this action. Fed.R.Civ.P. 12(h)(3); Clark v. Paul Gray, Inc., 306 U.S. 583, 588, 59 S.Ct. 744, 748, 83 L.Ed. 1001 (1939).
 
 
 10
 The Tucker Act, 28 U.S.C. Secs. 1346(a)(2), 1491 (1982), vests exclusive jurisdiction in the Claims Court of actions against the United States which are based on "any Act of Congress, or any regulation of an executive department" and which seek monetary damages in an amount greater than $10,000. "Moreover, it is firmly established that, where the real effort of the complaining party is to obtain money from the federal government, the exclusive jurisdiction of the court of claims ... cannot be evaded ... by framing a district court complaint to appear to seek only injunctive, mandatory or declaratory relief against government officials...." Bakersfield City School District v. Boyer, 610 F.2d 621, 628 (9th Cir.1979); accord McKeel v. Islamic Republic of Iran, 722 F.2d 582, 590-91 (9th Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984).
 
 
 11
 The instant appeal is from a class action represented by Chula Vista City School District (Chula Vista) and an action brought jointly by Poway Unified School District (Poway) and Sweetwater Union High School District (Sweetwater), which were consolidated in the district court. Although both complaints purport to ask for equitable relief, the "real effort" of each is to seek money. Chula Vista's complaint demanded "[t]hat the [District] Court declare that the class members be entitled to the local contribution rates requested in their highest revised Applications for ... 1979" and "issue a mandatory injunction ordering ... Defendant to ... pay to the class members [aid for] 1979 based on their highest revised Applications." Similarly, plaintiffs Poway and Sweetwater prayed "[t]hat the court declare that plaintiffs are entitled to the local contribution rate requested in their revised applications for ... 1979" and "compel defendant ... to approve their revised applications."
 
 
 12
 The revised applications of plaintiffs Poway and Sweetwater requested, in addition to aid already paid pursuant to applications that conformed with the $50 Rule, $462,000 and $167,000 respectively. These claims clearly exceeded the jurisdictional amount.
 
 
 13
 The aggregate claims of the class that were denied by the Secretary total in excess of twelve million dollars. The claims of the class members, however, do not stem from "a single title or right in which they have a common and undivided interest." Snyder v. Harris, 394 U.S. 332, 335, 89 S.Ct. 1053, 1056, 22 L.Ed.2d 319 (1969) (discussing aggregation for diversity jurisdiction in class action). Thus, in determining the amount in controversy for jurisdictional purposes, this court looks to the claim of each individual class member rather than the total claims of the class. Kester v. Campbell, 652 F.2d 13, 15 (9th Cir.1981) (Tucker Act, class action), cert. denied, 454 U.S. 1146, 102 S.Ct. 1008, 71 L.Ed.2d 298 (1982); March v. United States, 506 F.2d 1306, 1309 n. 1 (D.C.Cir.1974) (same); see also Zahn v. International Paper Co., 414 U.S. 291, 301, 94 S.Ct. 505, 512, 38 L.Ed.2d 511 (1973) (minimum amount for diversity jurisdiction, class action); Glover v. Johns-Manville Corp., 662 F.2d 225, 231 (4th Cir.1981) (Tucker Act, multiple third-party complainants). Class members whose claims appear on the record to meet the jurisdictional requirement can maintain the action, but the others must be dismissed. See Zahn, 414 U.S. at 301, 94 S.Ct. at 512 (diversity jurisdiction); Paul Gray, 306 U.S. at 590, 59 S.Ct. at 749 (same). The difference between the amounts requested in the original and the amended applications of six of the fifty-five class members was ten thousand dollars or less.[1] The claims of the other class members are dismissed for lack of jurisdiction.
 
 
 14
 II. Consistency of the $50 Rule With the Impact Aid Law
 
 A. Standards of Review
 
 15
 This court reviews the district court's summary judgment de novo. Lojek v. Thomas, 716 F.2d 675, 677 (9th Cir.1983).
 
 
 16
 The amount of deference due to the Secretary's formulation of the Rule itself was stated in Good Samaritan Hospital, Corvallis v. Mathews, 609 F.2d 949 (9th Cir.1979): "if an agency's interpretation of a statute ... is not clearly outside its authority, then the courts should defer to the agency's expertise." Id. at 954 (citing Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). Deference is made especially appropriate by the fact that the institution of the $50 Rule was contemporaneous with the implementation of the Impact Aid law. See Tallman, 380 U.S. at 16, 85 S.Ct. at 801, quoting Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961).
 
 B. Analysis
 
 17
 The Impact Aid law, as noted above, requires the selection of "generally comparable" school districts but does not give any guidance for determining comparability. The district court found the $50 Rule to be inconsistent with the statute on the basis of the following legislative history.
 
 
 18
 Among other things the Commissioner would first consider similarity of classification under State law, and then other relevant factors, such as number and kind of school population, tax resources, tax effort, costs of school maintenance and operation, and the like.
 
 
 19
 House Report, supra, at 14. The court reasoned that
 
 
 20
 if Congress had intended to limit an applicant's local contribution rate to an amount that was close to/or within some kind of a tolerance of expenditures, of local revenues of that district, I think it would have been very simple to do so. Congress could have specifically said there shall be a limit, there shall be a cap. Now, the statute requires a comparison of districts more than a single criterion or rule, and the fifty dollar rule which appears to me in its effect an application here as a cap ... I don't think is consistent with the statute....
 
 
 21
 The district court apparently concluded that no single factor, such as local contribution rate, could be controlling in the sense that dissimilarity of that one criterion would eliminate a school from being considered "comparable" for purposes of the statute. To take a simple example, the district court would consider a candidate eligible for comparable status to the applicant even though dissimilar as to local contribution under the $50 Rule, if there was similarity in five of the fourteen grid criteria.
 
 
 22
 We do not think the district court's conclusion necessarily follows from the legislative history. Congress' enumeration of several factors does not limit the Secretary's power to deem some more important than others, even to the extent of being controlling. Thus, it is not unreasonable for the Secretary to consider some criteria to be more indicative than others and one, such as similarity in local contribution, to be so important that a candidate must meet it to be considered comparable. This is precisely the kind of statutory interpretation to which the Supreme Court has indicated that we should defer; namely, the application of administrative expertise to implement a reasonable interpretation of congressional intent. See generally Tallman, 380 U.S. at 16, 85 S.Ct. at 801; see also Hawaiian Electric Co. v. EPA, 723 F.2d 1440, 1447 (9th Cir.1984).
 
 
 23
 Another portion of the House Report is more difficult to interpret. The report inadequately explains the need for the device of "generally comparable" districts:
 
 
 24
 In a school district providing education to large numbers of children connected with Federal property, the current expenditures will be affected by the fact that the Federal Government is not contributing its proper share of local school revenues. Hence, in arriving at a sum which approximates the cost of providing education to the Federal children in question, it would not be reasonable to consider merely current expenditures met from local revenues of the district in question.
 
 
 25
 House Report, supra, at 14.
 
 
 26
 Plaintiffs explain this passage by suggesting that it would be unfair to award an applicant (for each federally-connected child) an amount equal to its total local contribution divided by the number of its non-federally-connected pupils. They intimate that this is true because the federal government generally takes the most valuable property in a school district and that in its absence local contribution per child would rise without an increase in property tax rates. But there is no evidence for the factual predicate that land taken by the government is of greater than average value. See House Report, supra, at 4 (noting that land taken by the government was "sometimes very valuable" but that "[i]n some cases the original value of the land was not great and the tax revenue eliminated is inconsequential"). In addition, this argument assumes that section 238 intends to compensate districts for their loss of income resulting from a reduction in tax base caused by the government's acquisition of real property. But the House Report states that under section 238, "Federal payments to school districts are more closely related to the 'burden imposed' than to the value of the Federal property." House Report, supra, at 11. In fact, 20 U.S.C. Sec. 237, which is not involved in this dispute, does compensate districts for their decreased tax base due to federal occupation of property and there is no suggestion that the operation of section 238 precludes concurrent application of section 237. In fact, section 237 seems to be written to accommodate simultaneous application of the two. See 20 U.S.C. Sec. 237(a)(3).
 
 
 27
 The cryptic portion of the House Report states that "it would not be reasonable to consider merely current expenditures met from local revenues of the district in question." If the current expenditures were divided by the number of non-federal pupils an inflated cost per pupil would be obtained. For example if total school expenditures were $100,000 and there were twenty students, of whom ten were federal, average costs determined by non-federal students would be $10,000 although actually only $5,000 would be expended per pupil. More conjecture is required if we hypothesize dividing expenditures by the total number of federal and non-federal children. It would be likely, however, that, prior to the passage of the Act, when a substantial number of federal children impacted the district the average cost of federal and non-federal pupils would be lower than in comparable non-impacted districts. To provide equivalent educational services for the increased number required higher tax rates. Resistance to such increased taxes would be apt to cause a lower amount to be spent per child. Thus the device of "comparable districts" achieved a more equitable reimbursement than either of these more simple measures.
 
 
 28
 The one clear observation that can be drawn from the legislative history is that impact aid "seeks to compensate school districts in reasonable amounts for the cost of educating children who ... reside on tax-exempt Federal property." House Report, supra, at 11 (emphasis added). This intention was also expressed in the statute. See 20 U.S.C. Sec. 236(2). Plaintiff Chula Vista's local contribution per non-federally-connected child was $467, while the amount of recoupment it claimed for each federally-connected child in its second amended application was $1,473. Such an award would far exceed "compensation."
 
 
 29
 The legislative history admonishes the Secretary, when determining comparability, to consider districts' "tax resources, tax effort, costs of school maintenance and operation, and the like." House Report, supra, at 14. In fact, it mentions specifically only two nonfinancial factors (classification under state law and number and type of school population). This concern supports the emphasis given by the $50 Rule.
 
 
 30
 Finally, the Secretary observes that sometime after the enactment of the Impact Aid law, Congress considered abolishing the method involved here of determining comparable districts in which an applicant district proposes allegedly comparable districts. Congress feared that "[a]n applicant district which uses [this method] may 'hunt around' ... to find ... districts with the highest local expenditure per child, which it feels it can justify as being comparable." H.R.Rep. No. 1814, 89th Cong., 2d Sess., reprinted in 1966 U.S.Code Cong. & Ad.News 3844, 3876. Ultimately, Congress found no such abuse and permitted this method, compare Elementary & Secondary Education Amendments of 1966, Pub.L. No. 89-750, Sec. 201(b), 80 Stat. 1191, 1210 with Elementary & Secondary Education Amendments of 1967, Pub.L. No. 90-247, Sec. 206, 81 Stat. 783, 809 (1968), very possibly because the $50 Rule was then in effect.
 
 
 31
 In sum, although isolated portions of the legislative history might favor the plaintiffs' position, we conclude that the bulk of the legislative history supports the $50 Rule, which relates the amount of federal aid to the local contribution rate.
 
 III. Notice and Comment Procedures
 
 32
 The parties agree that because it concerns the conditions under which the federal government makes a grant, the $50 Rule is not required to comply with the Administrative Procedure Act (APA). See also 5 U.S.C. Sec. 553(a)(2) (1982); Good Samaritan Hospital, 609 F.2d at 953.
 
 
 33
 The class representatives, however, do argue that the district court erred in holding that similar notice provisions in GEPA do not apply to the Rule. That Act, 20 U.S.C. Sec. 1232(b), states that
 
 
 34
 (1) No proposed regulation prescribed for the administration of any applicable program may take effect until thirty days after it is published in the Federal Register.
 
 
 35
 (2)(A) During the thirty-day period prior to the date upon which such regulation is to be effective, the Commissioner shall, in accordance with the [APA, observe notice-and-comment procedures].
 
 
 36
 Section 1232(a)(1) clarifies that "[f]or the purpose of this section, the term 'regulation' means any rules, regulations, guidelines, interpretations, orders, or requirements of general applicability prescribed by the Commissioner."
 
 
 37
 In referring to these provisions, however, Congress stated that "all agencies and organizations which are recipients of federal education funds must be apprised of any proposed additions or changes which affect their programs and must be afforded an opportunity to comment upon them." H.R.Rep. No. 805, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4093, 4154 (emphasis added). Thus, the body of rules and regulations already in effect when GEPA was passed, including the rule at issue here, was not meant to be subjected to its notice-and-comment provisions.
 
 
 38
 This conclusion is supported by the fact that when Congress in 1972 required the Commissioner of Education to conduct a study of existing rules and regulations and to publish those rules in the Federal Register after an opportunity for notice-and-comment hearings, it excepted from such study and publication unpublished rules and rules which had been issued prior to July 1, 1965. See Education Amendments of 1972, Pub.L. No. 92-318, Sec. 503(a), 86 Stat. 235, 346.
 
 IV. Uniform Application of the Rule
 A. 20 U.S.C. Sec. 1232(c)
 
 39
 20 U.S.C. Sec. 1232(c) provides that "[a]ll such regulations shall be uniformly applied and enforced throughout the fifty States." Plaintiffs argue that this provision was violated because "the Agency applied the grid without the '$50 Rule' in its review processes for fiscal year 1979 except with respect to the Class Members' amended applications."
 
 
 40
 In this case, the $50 Rule was not selectively enforced against plaintiffs in any meaningful sense. Instead, the Secretary's temporary suspension of the rule and consequent approval of some applications which did not comply with it was an experimental aberration from a longstanding policy.
 
 
 41
 The apparent purpose of section 1232(c) is to promote nationwide uniformity in application and enforcement of the Secretary's regulations. It would not further this purpose to prevent the Secretary from changing policy. Yet if we adopted plaintiffs' position, we would in effect preclude the Secretary from reimplementing a regulation after experimenting and discovering that it was indeed necessary. We hold that the Secretary's temporary suspension of the $50 Rule was not a violation of section 1232(c).
 
 B. Estoppel
 
 42
 The school districts also argue that the government is estopped from enforcing the $50 Rule as to them. The Supreme Court has never decided that estoppel may run against the government. See Heckler v. Community Health Services, --- U.S. ----, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984); see also United States v. Locke, --- U.S. ----, 105 S.Ct. 1785, 1790 n. 7, 85 L.Ed.2d 64 (1985); id. 105 S.Ct. at 1801-02 (O'Connor, J., concurring) (declining to rule on estoppel against federal government but suggesting parties raise it on remand). Furthermore, even if the government can be estopped "it is well-settled that the Government may not be estopped on the same terms as any other litigant.... [T]he private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present." Heckler, 104 S.Ct. at 2224 (footnotes omitted). Among those elements, it is "tolerably clear" that "the party claiming the estoppel must have relied on its adversary's conduct 'in such a manner as to change his position for the worse.' " Id. at 2223 & n. 9, quoting III J. Pomeroy, Equity Jurisprudence Sec. 805, at 192 (S. Symons ed. 1941).
 
 
 43
 In this case, plaintiffs have alleged no such change in position. There is no allegation that plaintiffs have, in reliance on the approval of their amended applications, incurred obligations which they will be unable to discharge. Moreover, the Community Health Services Court held that such obligations, even though they might bankrupt the private party, did not suffice to show prejudicial reliance. See id. at 2225. The government is not estopped from enforcing the $50 Rule.
 
 CONCLUSION
 
 44
 We hold that the district court could properly assert subject matter jurisdiction over only six of the class plaintiffs. The Secretary's $50 Rule is consistent with the Impact Aid law and is not required to comply with the notice-and-comment provisions of the General Education Provisions Act. The judgment of the district court is therefore
 
 
 45
 REVERSED.
 
 
 
 [1]
 Brentwood Union Elementary School District ($8007.13); Byron U.E.S.D. ($3589.05); Oakley U.E.S.D. ($6825.40); Rescue U.E.S.D. ($9528.41); St. Helena Unified School District ($3309.34); and Soledad U.E.S.D. ($8497.41)