# Debt Obligations of the National Credit Union Administration

Debt obligations of the National Credit Union Administration, lawfully incurred on behalf of the Central Liquidity Facility, pursuant to 12 U S.C § 1795f(a), represent obligations of the United States backed by its full faith and credit.

There is a presumption, historically reflected in opinions of the Attorney General, that federal agency obligations are supported by the full faith and credit of the United States, unless the statute authorizing such obligations expressly provides otherwise. This presumption extends to obligations incurred by an agency on behalf of a non-federal entity.

While principles of restraint and respect for the Comptroller General as an agent of Congress ordinarily require that his opinions be accorded substantial weight by the Attorney General, in this case the Comptroller General failed properly to apply the legal principles governing full faith and credit which are delineated in the opinions of the Attorney General.

Opinions of the Attorney General on matters of law are, as a matter of course, to be followed by all officers of the Executive Branch.

May 24, 1982

## MEMORANDUM OPINION FOR THE PRESIDENT, CENTRAL LIQUIDITY FACILITY, NATIONAL CREDIT UNION ADMINISTRATION

This responds to your request for an opinion concerning debt obligations to be issued by the National Credit Union Administration (NCUA) on behalf of the Central Liquidity Facility (CLF or Facility) pursuant to 12 U.S.C. § 1795f(a) (1982). The NCUA is considering issuing these obligations for the CLF in order to fund the latter's lending activities. Previous to this request, you received an opinion from the Comptroller General of the United States[1] regarding NCUA's authority to issue these debt securities. That opinion stated that the NCUA has authority to issue debt securities on behalf of the CLF, but that these securities would not constitute obligations of the United States supported by its full faith and credit. Because the Comptroller General's opinion may impair the CLF's ability to perform its lending function, you have asked us to review the full faith and credit questions,[2] and to address additional questions that have arisen as a

---

[1] Comp. Gen. Dec., File: B–204227 (Oct. 21, 1981) (hereinafter Comp. Gen Dec.).

[2] Since 1973, it has been the policy of the Department of Justice to decline to issue formal opinions on full faith and credit matters unless there is drawn into question a genuine issue of law. See Elliot L. Richardson, Attorney General, Memorandum for Heads of the Executive Departments and Counsel to the President (Oct 10, 1973). In this case we find both a substantial issue of law, and a misapplication by the Comptroller General of a series of opinions of the Attorney General which treat the obligations of the United States Therefore we have decided to address the full faith and credit issue you present.

result of the Comptroller General's opinion.[3]

We find—contrary to the Comptroller General's opinion[4]—that lawful debt obligations of the NCUA incurred on behalf of the CLF represent obligations of the United States backed by its full faith and credit.

# I.

The Central Liquidity Facility was established in 1978 by the National Credit Union Central Liquidity Facility Act (CLF Act), Pub. L. No. 95–630, Title XVIII, *codified at* 12 U.S.C. § 1795 (1982). The CLF's function is to provide for the "liquidity needs" of member credit unions.[5] The CLF "exist[s] within" the National Credit Union Administration[6] and is managed by the NCUA Board. 12 U.S.C. § 1795b. Credit unions may become "members" of the CLF by subscribing to, and holding, CLF capital stock. 12 U.S.C. §§ 1795c, 1795d. Member credit unions are entitled to apply for credit advances, 12 U.S.C. § 1795e(a)(1), but they have no control over, or management responsibilities for, the CLF.

The Facility's lending activity is funded through its capital stock and through borrowing. To date, all borrowing for the CLF has been from the Federal Financing Bank, a corporate instrumentality within the Department of the Treasury.[7] Recently, however, the CLF was requested by the Office of Management and Budget to develop plans to borrow in the private capital markets.[8] The CLF lacks the power to borrow from any source, but the CLF Act provides clear authority for the NCUA Board to incur obligations on its behalf.

The Board on behalf of the Facility shall have the ability to—

      *        *        *        *        *

(4) borrow from—(A) any source, provided that the total face

---

[3] These questions concern the CLF's possible exposure to liabilities arising from other NCUA activities. For example, you ask our concurrence in your General Counsel's determination that hypothetical claimants against the National Credit Union Share Insurance Fund might look only to the assets of the Fund for satisfaction of their claims. We believe our resolution of the full faith and credit issue makes it unnecessary to address these additional questions

[4] Principles of restraint and respect for the authority of the Comptroller General as an agent of Congress require that his opinions be accorded substantial weight by the Attorney General *See, e g.,* 41 Op. Att'y Gen. 507, 512 (1960); 41 Op Att'y Gen. 463, 473 (1960). However, disagreements sometimes do occur, *see, e.g.,* 41 Op. Att'y Gen. 507 (1960); 37 Op Att'y Gen 559 (1934), 37 Op. Att'y Gen. 562 (1934), and in this case we believe the Comptroller General failed properly to apply the presumption governing full faith and credit matters which is delineated in the opinions of the Attorney General. These opinions are, as a matter of course, to be followed by all officers of the Executive Branch *See* 37 Op Att'y Gen. 562, 563 (1934); 20 Op Att'y Gen. 648 (1893) *See generally* 28 U S.C. § 512; *Smith* v *Jackson,* 241 Fed 747, 773 (5th Cir. 1917), *aff'd,* 246 U.S. 388 (1918).

[5] The statutory definition of "liquidity needs" was designed to restrict the CLF to lending only for the purpose of providing traditional credit union—as distinct from corporate central credit unions—with credit to meet emergency outflows resulting from management difficulties, local economic downturns, seasonal credit needs, or regional economic decline. *See* 12 U.S C. § 1795a(1), 124 Cong Rec 38842 (1978) (remarks of Rep St Germain). The CLF is prohibited from providing credit the purpose of which is "to expand credit union portfolios." 12 U.S.C § 1795e(a)(1)

[6] The NCUA is "established in the executive branch" as "an independent agency," 12 U.S.C. § 1752a(a), and is managed by a three-member Board "appointed by the President, by and with the advice and consent of the Senate." 12 U S.C § 1752a(b).

[7] *See generally* 12 U.S.C §§ 2281–2296 (1982).

[8] This information was contained in your opinion request. *See also Department of Housing and Urban Development—Independent Agencies Appropriations for 1982, Hearings Before a Subcommittee of the House Committee on Appropriations,* 97th Cong., 1st Sess. 311–12 (Feb. 5, 1981) (testimony of Lawrence Connell, Chairman, NCUA) (expressing wish to end reliance on borrowing from Federal Financing Bank).

value of these obligations shall not exceed twelve times a sub-
scribed capital stock and surplus of the Facility[.]

12 U.S.C. § 1795f(a). The issue to be resolved is whether this language provides
full faith and credit backing for NCUA obligations incurred on behalf of the
Facility.

## II.

It has long been the position of the Attorney General that when Congress
authorizes a federal agency or officer to incur obligations, those obligations are
supported by the full faith and credit of the United States, unless the authorizing
statute specifically provides otherwise.

> [T]here is no order of solemnity of valid general obligations of the
> United States and . . . no legal priority is afforded general obliga-
> tions contracted pursuant to an express pledge of faith or credit
> over those not so accompanied. It is enough to create an obligation
> of the United States if an agency or officer is validly authorized to
> incur such obligation on its behalf and validly exercises that
> power.

41 Op. Att'y Gen. 403, 405 (1959). *See also* 42 Op. Att'y Gen. 341, 344 (1967);
41 Op. Att'y Gen. 424, 430 (1959). *See generally Perry* v. *United States*, 294
U.S. 330, 353–54 (1935); *Lynch* v. *United States*, 292 U.S. 571, 580 (1934).
Thus,

> a guaranty by a Government agency contracted pursuant to a
> congressional grant of authority for constitutional purposes is an
> obligation fully binding on the United States despite the absence
> of statutory language expressly pledging its "faith" or "credit" to
> the redemption of the guaranty and despite the possibility that a
> future appropriation might be necessary to carry out such
> redemption.

42 Op. Att'y Gen. 21, 23–24 (1961). *See also* 42 Op. Att'y Gen. 429, 432 (1971);
42 Op. Att'y Gen. 327 (1966); 42 Op. Att'y Gen. 305, 308 (1965); 42 Op. Att'y
Gen. 183, 184 (1963).

The presumption that federal agency obligations are supported by the full faith
and credit of the United States absent statutory language to the contrary was
explicitly declared by the Attorney General in an opinion holding that the Small
Business Administration had authority to guarantee the sale of certain debentures
owned by it:

> [T]he threshold question concerning the effect of proposed SBA
> guaranties is not whether the statutory language expressly alludes
> to the "faith" or "credit" of the United States, but whether the
> statutory scheme authorizes the guaranties here proposed. If there

264

> is statutory authority for the guaranties, *absent specific language
> to the contrary* such guaranties would constitute obligations of the
> United States as fully backed by its faith and credit as would be
> the case were those terms actually used.

*(Emphasis added.)* Letter from John N. Mitchell, Attorney General, to Thomas S. Kleppe, Administrator, Small Business Administration, at 3–4 (April 14, 1971) (hereafter "Kleppe letter"). *See also* 42 Op. Att'y Gen. 327, 328 (1966) (presumption applies not only to guarantees, but to any other "contractual liabilities" an agency is authorized to incur); 41 Op. Att'y Gen. 363, 369 (1958).

The presumption favoring full faith and credit support for federal agency obligations rests on a solid foundation of reason and equity. When a federal agency enters the marketplace and lawfully incurs debts, the public which becomes its creditor has a right to expect that, unless notified to the contrary, the agency's obligations will be supported by the government which created it and which considers it a constituent part. Requiring investors to guess the wishes of Congress in this area would be to require them to guess about the key feature of this type of investment: the security of government debt obligations. Furthermore, the government's interest in obtaining advantageous credit terms is promoted when the public justifiably assumes that, unless Congress has clearly provided otherwise, federal agency obligations are obligations of the United States government, not merely those of a single agency supported by its limited assets or periodic appropriations. For these reasons, we believe that when Congress authorizes federal agencies to incur obligations without placing specific restrictions on their backing, it does so in accordance with the presumption established in the opinions of the Attorney General.[9]

The borrowing authority at issue here, 12 U.S.C. § 1795f(a), nowhere expressly limits recourse for NCUA obligations to the resources of the CLF, the NCUA, or the two of them; nor can any such limitation reasonably be inferred. We therefore find that debt obligations of the NCUA incurred on behalf of the CLF pursuant to this provision are supported by the full faith and credit of the United States.

## III.

Our conclusion is based not only upon application of the full faith and credit presumption to the particular terms of the NCUA's borrowing provision; it is bolstered by the structure and language of that section as a whole. Examination of § 1795f(a) reveals that when Congress wished to place restrictions on Board obligations, it did so explicitly. Although not conclusive, we believe the maxim

---

[9] Evidence that Congress groups all lawful obligations of federal agencies together with obligations explicitly backed by the full faith and credit of the United States, and not with obligations incurred pursuant to statutes which expressly prohibit any guarantee by the United States, is found in 12 U.S C § 2286(a). That section provides that the Secretary of the Treasury must approve the method, source, timing, and financing terms of all "obligations issued or sold by any Federal agency; except that the approval of the Secretary of the Treasury shall not be required with respect to (A) obligations issued or sold pursuant to an Act of Congress which expressly prohibits any guarantee of such obligations by the United States. . . ."

*expressio unius est exclusio alterius* is applicable here.[10] First, Congress showed an intention to limit the obligations which the Board could incur on behalf of the Facility by limiting the *value* of those obligations to twelve times the stock and surplus of the Facility.[11] 12 U.S.C. § 1795f(a)(4). Notably, however, the *backing* for such obligations is not similarly limited.

More significant is the congressionally mandated limitation on guarantees which the Board may provide for financial obligations of member credit unions 12 U.S.C. § 1795f(a)(5) provides:

> The Board on behalf of the Facility shall have the ability to—
> (5) guarantee performance of the terms of any financial obligation of a member *but only when such obligation bears a clear and conspicuous notice on its face that only the resources of the Facility underlie such guarantee*[.]

(Emphasis supplied.) Had Congress intended similarly to limit NCUA debt obligations, we believe it would have included similar language in § 1795f(a)(4).

Finally, we believe a comparison between this provision and similar provisions governing the Federal Home Loan Bank system (FHLB) sheds light on this problem. The statute governing the FHLB is instructive because the CLF was created to serve the liquidity needs of credit unions in the same manner that the FHLBs serve savings and loan institutions.[12] Federal Home Loan Banks are authorized to "issue debentures, bonds, or other obligations upon such terms and conditions as the [FHLB] board may approve[.]" 12 U.S.C. § 1431(a) (1982). However, the FHLB statute goes on explicitly to limit the backing for FHLB obligations: "All obligations of Federal Home Loan Banks shall plainly state that such obligations are not obligations of the United States and are not guaranteed by the United States." 12 U.S.C. § 1435. Although in many ways Congress modeled the CLF's powers and functions after those of the FHLB,[13] it omitted from the CLF Act any provision similar to 12 U.S.C. § 1435. We therefore hesitate to infer a restriction on the backing of NCUA obligations where the statute is completely silent on the matter.

## IV.

As already noted above, the Comptroller General concluded that NCUA obligations incurred on behalf of the CLF would not be backed by the full faith

---

[10] *See generally TVA* v. *Hill*, 437 U.S. 153, 188 (1978), *Nat'l Railroad Passenger Corp* v *Nat'l Ass'n of Railroad Passengers*, 414 U.S. 453, 458 (1974); *Nashville Milk Co.* v. *Carnation Co.*, 355 U S 373, 376 (1958); *Duke v. Univ. of Texas*, 663 F.2d 522, 526 (5th Cir 1981) (all cases applying maxim); 2A, C Sands, *Statutes and Statutory Construction* § 47 23 (4th ed. 1973).

[11] This restriction may have been included not only to make the Facility's size more reasonable in relation to the credit union industry's assets, but also to limit the exposure of the government in the event of default *Cf. Community Credit Needs, Hearings Before Subcomm. on Financial Institutions Supervision, Regulation and Insurance, of the House Committee on Banking, Finance and Urban Affairs*, 95th Cong , 2d Sess. 208 (testimony of Phillip Jackson, Fed. Reserve Bd.) (hereinafter Community Credit Needs Hearings).

[12] *See id.* at 319, 329, 424; 124 Cong Rec 2421 (1978) (remarks of Rep. St Germain), 124 Cong Rec 30904 (1978) (remarks of Sen. Proxmire)

[13] *Id.*

and credit of the United States. This conclusion was based upon a careful and thorough search through the legislative history of 12 U.S.C. § 1795f(a) to find some hint of congressional intentions. We believe, however, that this search was largely unnecessary, and reached an incorrect conclusion.

The Comptroller General's opinion began by recognizing "the presumption of full faith and credit which, at least initially, is accorded to a Government agency. . . ."[14] The opinion also cited and expressed agreement with the holdings of the various Attorney General opinions which delineate this presumption.[15] The Comptroller General believed, however, that this presumption was inapplicable because "the agency involved [*i.e.*, the NCUA] is acting not on its own behalf but on behalf of a mixed-ownership Government corporation, albeit one established within the parent agency." Finding this to be a "critical distinction," the opinion stated that the full faith and credit presumption "does not necessarily apply to a mixed-ownership Government corporation."[16]

We find that the Comptroller General misapplied the presumption articulated in the Attorney General opinions favoring full faith and credit. Assuming *arguendo* that the presumption "does not necessarily apply to a mixed-ownership Government corporation," this does not preclude its application here, because the CLF does not incur obligations. It is the NCUA which incurs the obligations under 12 U.S.C. § 1795f(a), and the NCUA is an independent agency within the Executive Branch.[17] We do not understand the Comptroller General to contest the application of the presumption to independent agencies within the Executive Branch. *See, e.g.,* 41 Op. Att'y Gen. 403 (1959)[18] (ICC guarantee constitutes an obligation of the United States even though the statutory authority for guarantee does not contain language pledging faith or credit of the United States, and notwithstanding lack of an existing appropriation).

Moreover, once it is determined that a federal agency has authority to incur obligations, it is immaterial to the full faith and credit question that the obligation may be incurred "on behalf of" some other body or person.[19] Numerous Attorney General opinions treat government obligations incurred "on behalf of" non-federal entities. That fact has never played any part in a determination of the full faith and credit issue.[20] The presumption recognized by the Comptroller

---

[14] Comp Gen. Dec , *supra* note 1, at 4.

[15] *Id.*

[16] The CLF appears as a "mixed-ownership Government corporation" in 31 U.S.C. § 9101(2)(G) (1982)

[17] *See* note 6, *supra*

[18] Cited in Comp Gen Dec , *supra* note 1, at 4.

[19] At most, this fact may be relevant in determining whether a particular obligation of an agency is lawful, not whether it is backed by the full faith and credit of the United States

[20] *See, e g.,* 42 Op Att'y Gen 429 (1971) (Export-Import Bank guarantee of Private Export Funding Corp. obligations); 42 Op Att'y Gen. 341, 344 (1967) ("[In] a series of opinions of the Attorneys General . it was held that a Federal agency's guaranty or equivalent support of certain debt obligations *of a local Government agency or private person to the holders thereof* would be backed by the full faith and credit of the United States") (emphasis supplied), 42 Op. Att'y Gen 305, 308 (1965) ("the United States may become liable upon its undertaking to buttress *another's obligation* whether or not the governing statute uses language specifically confirming such liability") (emphasis supplied); 42 Op Att'y Gen 183 (1963) (AID guarantees to U.S. citizens and enterprises in respect of investments made in foreign countries), 42 Op. Att'y Gen 21 (1961) (Development Loan Fund guarantees to private investors with respect to loans "contributing to the economic progress" of foreign nations), 41 Op Att'y Gen. 424 (1959) (guarantee of housing mortgages for military personnel).

267

General favoring full faith and credit "absent specific language to the contrary"[21] should therefore have been applied to the obligations of the NCUA under 12 U.S.C. § 1795f(a).

It was unnecessary for the Comptroller General to attempt to divine congressional intent through an exhaustive examination of the legislative history of 12 U.S.C. § 1795f, because the policies underlying the presumption would be frustrated if liability for federal agency obligations could be limited simply by reference to obscure statements made in subcommittee hearings or the like.[22] For this reason many determinations of full faith and credit matters by the Attorney General have been made without reference to legislative history.[23]

However, because the Comptroller General found the legislative history of 12 U.S.C. § 1795f(a) to be controlling, we have carefully reviewed that history and found it to be, at best, inconclusive. The legislative history nowhere reveals any clear statement one way or the other regarding congressional intent concerning full faith and credit for NCUA obligations. The following two sections discuss the Comptroller General's legislative history argument and post-enactment evidence.

### A. The Deletion of Language Providing for NCUA Authority to Borrow "With or Without the Guarantee of the United States."

The initial version of the title establishing the CLF was approved by the Senate on October 12, 1978, when it passed its own version of H.R. 14279,[24] the bill which ultimately became Pub. L. No. 95–630. As initially passed by the Senate, the CLF borrowing provision read as follows:[25]

> The Administrator on behalf of the Facility shall have the authority to—
>
> \*     \*     \*     \*     \*
>
> (4) Borrow from—(A) any source *with or without the guarantee of the United States as to principal and interest*. The total face value of those obligations guaranteed by the United States shall not exceed twenty times the subscribed capital stock and surplus of the Facility[.]

Thus just three days before the CLF statute was sent to the President for signature the Senate had approved language explicitly providing government guarantees for NCUA borrowing.[26]

---

[21] Kleppe letter, *supra* p 5

[22] We are not faced with a question raised by a statute whose terms do not limit full faith and credit, but whose legislative history explicitly and plainly evinces a congressional intention to do so *See* text immediately *infra*.

[23] *See, e.g* , 42 Op Att'y Gen. 429 (1971); 42 Op. Att'y Gen. 417 (1969); 42 Op. Att'y Gen. 327 (1966); 42 Op. Att'y Gen. 305 (1965); 41 Op. Att'y Gen 403 (1959); 41 Op. Att'y Gen 363 (1958). *See also* 42 Op Att'y Gen 323 (1966) (finding *unpersuasive* certain legislative history opposing application of full faith and credit; *see* note 36 *infra*). *Cf.* 42 Op. Att'y Gen. 183 (1963); 42 Op Att'y Gen 21 (1961); 41 Op. Att'y Gen 424 (1959)

[24] 95th Cong., 2d Sess. (1978). *See* 124 Cong. Rec. 36120, 36134–36 (Oct. 12, 1978).

[25] 124 Cong. Rec. 36135 (Oct. 12, 1978) (emphasis supplied).

[26] As the Comptroller General notes, this initial version of the CLF borrowing provision was identical to that contained in a number of bills to establish the CLF that had been considered by both Houses of Congress. *See, e g* , S 3499, 95th Cong., 2d Sess (1978); H R. 11310, 95th Cong., 2d Sess (1978) These bills unambiguously authorized a government guarantee for NCUA debts incurred on behalf of the Facility. As the Senate Report accompanying S. 3499 explained, "[u]p to 20 times the paidin capital may be borrowed utilizing a Federal government guarantee" S. Rep. No 1273, 95th Cong., 2d Sess. 6 (1978).

Action in the House was more ambiguous. On October 14, 1978, the House concurred in the Senate's amendments to H.R. 14279, but substituted a House Banking subcommittee's language regarding the establishment of the Central Liquidity Facility.[27] The House debate on October 14th did not explain the purpose of this substitution. On the following day the House substitute was concurred in by the Senate,[28] and it was this language which became law when signed by the President on November 10, 1978.

The House language adopted on October 14, 1978, originated as Title III of H.R. 14044, 95th Cong., 2d Sess. (1978). Although reported out of the Subcommittee on Financial Institutions Supervision, Regulation and Insurance on September 22, 1978, the House Banking Committee did not complete consideration of this bill before adjournment, and no committee report explaining the CLF provisions was written. On November 9, 1978, over three weeks after final congressional action had occurred, Subcommittee Chairman St Germain inserted into the Congressional Record language which he said "would have been included in the House report on this significant title."[29] This would-be report on H.R. 14044 provides no evidence of any intention to deny full faith and credit support to the debt obligations of the NCUA.[30]

The Comptroller General insists, however, that an investigation into the origins of H.R. 14044 reveals an intention by the House to deny full faith and credit to NCUA obligations. In introducing H.R. 14044, Rep. St Germain provided the following explanation of the CLF provisions in the bill.

> Title III [of H.R. 14044] establishes a central liquidity facility for credit unions and is almost identical to H.R. 11310 [95th Cong., 2d Sess. (1978)]. The changes [from H.R. 11310] reflect suggestions made by National Credit Union Administrator Lawrence Connell, Gov. Phillip Jackson of the Board of Governors of the Federal Reserve System and others during subcommittee hearings. The changes are:
>
> *          *          *          *          *
>
> Sixth. *Revised borrowing authority* to limit the total amount of such borrowing to twelve times capital stock and surplus of the facility. *The 12 would apply whether the borrowings have a Government guarantee or not.* This is comparable to the borrowing authority for other Federal Government entities.[31]

124 Cong. Rec. 28805 (1978) (emphasis supplied).[32]

---

[27] 124 Cong Rec 38287, 38311–13 (1978)

[28] 124 Cong. Rec S 19146 (Oct 15, 1978)

[29] 124 Cong Rec 38842–43 (1978)

[30] The only remark relevant to NCUA's borrowing authority states, "Finally, the Administrator is authorized to issue debt obligations on behalf of the facility, in a total face value not exceeding 12 times the subscribed capital stock and surplus of the facility." 124 Cong. Rec. 38843 (1978)

[31] Rep. St Germain was probably referring to a comparable requirement that FHLB borrowing be limited to 12 times its capital and reserves. 12 C.F R § 506 1.

[32] The Comptroller General acknowledges that "at first glance" Rep St Germain's remarks might suggest that under the revised language CLF borrowings *would be covered* by a government guarantee We agree

269

In order fully to understand the meaning of the underlined sentence, we must refer to the original provisions of H.R. 11310, which permitted the Administrator, on behalf of the Facility, to borrow from

> any source *with or without the guarantee of the United States* as to principal and interest. The total face value of *those obligations guaranteed by the United States* shall not exceed 20 times the subscribed capital stock and surplus of the Facility[.][33]

(Emphasis added.) H.R. 14044 altered H.R. 11310 in two respects: (1) it restricted the total amount of NCUA borrowing authority to twelve times the capital stock and surplus of the Facility; and (2) it specified that this lower limit would apply, in Rep. St Germain's words, "whether the borrowings have a Government guarantee or not." Rep. St Germain's comments do not reveal any intention to eliminate government guarantees, but merely to limit the maximum amount the NCUA could borrow by issuing government guaranteed obligations.

The Comptroller General disagrees, and finds that Rep. St Germain's changes in H.R. 14044 reflect suggestions made by Phillip Jackson, a member of the Federal Reserve Board of Governors, in hearings before the Congressman's subcommittee. In his testimony, Mr. Jackson proposed two amendments to H.R. 11310:[34]

> The [Federal Reserve] Board has discussed a few modifications and clarifications to the proposed legislation with the National Credit Union Administration. During those discussions, the Administrator of the NCUA indicated that he agrees that these changes would improve the bill. One amendment would clarify that the private borrowings of the facility would not have the U.S. Government's guarantee. Another would reduce the borrowing leverage on capital to ten times capital, which would make the facility's size more reasonable in relation to industry assets.

There are three reasons why we believe the Comptroller General's reliance upon Mr. Jackson's suggestions is misplaced. First, statements made in congressional hearings by witnesses are generally accorded little weight in construing statutes.[35] This is especially so in this instance, where the witness's remarks about full faith and credit were cursory and failed to address the substantial body of precedent in this area found in the opinions of the Attorney General.[36]

---

[33] H.R. 11310, § 307, *reprinted in* Community Credit Needs Hearings, *supra* note 11, at 364, 371–72 (emphasis supplied).

[34] *See* Community Credit Needs Hearings, *supra* note 11, at 208

[35] *See McCaughn* v. *Hershey Chocolate Co* , 283 U S. 488, 493–94 (1931); *Austasia Intermodal Lines, Ltd* v *FMC*, 580 F.2d 642, 645 (D C. Cir 1978); *March* v. *United States*, 506 F 2d 1306, 1314 & n.30 (D C. Cir 1974); *United States* v *Fairfield Gloves*, 558 F.2d 1023, 1027 (C C.P A 1977)

[36] In 42 Op Att'y Gen 323 (1966), the Attorney General held that guarantees by the Federal National Mortgage Association of certain "participation certificates" gave rise to general obligations of the United States. The opinion recognized that contrary statements were to be found in the legislative history asserting that the Mortgage Association's guarantees were not backed by the full faith and credit of the United States The Attorney General discounted these statements, in part because the full faith and credit opinions of the Attorney General "were not brought to the attention of the witnesses and committee members during the cited hearings, [and] it appears that the persons making the statements I have referred to did not take them into account." *Id.* at 324

Second, Mr. Jackson's remarks were partially inaccurate, and his suggestions were not all incorporated into H.R. 14044, the bill that was eventually adopted. For example, contrary to Mr. Jackson's declaration that the NCUA endorsed his suggestions,[37] the NCUA Administrator specifically objected to Jackson's proposals, noting that "[Jackson's proposal] significantly reduces the CLF's lending capacity and NCUA cannot accept it. . . ."[38] In addition, Mr. Jackson's recommendation to reduce the borrowing leverage of the CLF to ten times capital was at best only partially reflected in H.R. 14044, where the limit was revised to 12 times capital. Under these circumstances, Mr. Jackson's testimony cannot be said to have had a determinative effect on the outcome of the CLF provisions.

We note, finally, that *no* Member of Congress and *no* committee report confirms Mr. Jackson's views regarding full faith and credit backing for NCUA obligations. In fact the only evidence that Mr. Jackson had any effect whatever on the outcome is found in Rep. St Germain's statement that H.R. 14044 reflects "suggestions made by National Credit Union Administrator Lawrence Connell, Gov. Phillip Jackson of the Board of Governors of the Federal Reserve System and others during subcommittee hearings."[39] The most reasonable interpretation of this remark—and of the changes made in H.R. 11310 resulting in H.R. 14044—is that the drafters took account of both Mr. Jackson's and Mr. Connell's suggestions and limited the borrowing authority and limited similarly the liability of the United States to 12 times capital. We find no indication that the drafters of H.R. 14044 intended to remove completely the government's backing for NCUA obligations.[40]

## B. Post-enactment Remark in Senate Appropriations Committee Report.

In addition to reviewing the legislative history of § 1795f(a), the Comptroller General cites the following brief remark from a Senate Appropriations Committee report written subsequent to enactment of the CLF Act:

> The principal source of funds for the lending operations [of the CLF] are the stock subscriptions by credit unions and the sale of obligations by the facility. These obligations are not guaranteed by the U.S. Government as to either principal or interest.[41]

This post-enactment remark lacks any support or accompanying analysis, and it was written by a committee which had no responsibility for drafting the Act it

---

[37] *See* note 34, *supra*

[38] Community Credit Needs Hearings, *supra* note 11, at 345.

[39] 124 Cong. Rec 28805 (1978).

[40] Furthermore, as a general matter

[we] must exercise caution before drawing inferences regarding legislative intent from changes made in committee without explanation Although a succession of draft bills may point toward a clear legislative purpose, amendments to a bill's language are frequently latent with ambiguity: they may either evidence a substantive change in legislative design or simply a better means for expressing a provision in the original bill.

*Western Coal Traffic League* v *United States*, 677 F.2d 915, 924, *cert. denied*, 459 U.S. 1086 (1982) (citations omitted).

[41] S. Rep No 258, 96th Cong., 1st Sess. 63 (1979).

271

was describing. Such post-enactment statements are not entitled to substantial weight. *See Mathews* v. *Weber,* 423 U.S. 261, 272 n.7 (1976); *Dawson* v. *Myers,* 622 F.2d 1304, 1312 (9th Cir. 1980), *vacated on other grounds,* 101 S. Ct. 1961 (1981).

We therefore conclude that obligations of the NCUA incurred on behalf of the Central Liquidity Facility pursuant to 12 U.S.C. § 1795f(a) are supported by the full faith and credit of the United States.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

272