**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, Petitioner,**

v.

**F. Ray MARSHALL, Secretary of Labor, United States Department of Labor, Respondent.**

**No. 79–1517.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 22, 1980.

Decided July 22, 1980.

Leonard R. Page, M. Jay Whitman, Detroit, Mich., with whom John A. Fillion, Detroit, Mich., was on brief, for petitioner.

John R. Garson, U.S. Dept. of Labor, Washington, D.C., with whom Diddo Ruth Clark, Washington, D.C., was on brief, for respondent.

Before WRIGHT, Chief Judge, MIKVA, Circuit Judge, and MARKEY *, Chief Judge, United States Court of Customs and Patent Appeals.

Opinion PER CURIAM.

PER CURIAM:

This is the second visit of this litigation to this court. The facts and issues raised are fully set out in our prior opinion, *Int'l Union, UAW v. Marshall*, 584 F.2d 390 (D.C. Cir.1978) ("*UAW I*"). Basically, the dispute is focused on the Secretary of Labor's choice of individual automobile assembly plants as the "appropriate subdivision[s]" in this case for purposes of making worker adjustment assistance determinations pursuant to section 222 of the Trade Act of 1974, 19 U.S.C. § 2272 (1976).[1] We remand-

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. Section 222 provides:

The Secretary shall certify a group of workers as eligible to apply for adjustment assistance under this part if he determines—

(1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have be-come totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to

ed the case before because the Secretary failed to set forth his reasons for adopting the plant-by-plant approach in the administrative record. As we explained then:

> We remand to the Secretary for a clarification of the reasons underlying the determination of "an appropriate subdivision." Even if a more detailed inquiry does not change the result in this case, the class of those seeking or considering adjustment assistance will be afforded (1) a description of the circumstances that the Secretary believes mandate the choice of the plant as the appropriate subdivision and (2) an explanation why he holds that opinion.

584 F.2d at 397–98. The Secretary's explanation is now in the record.[2] Joint Appendix (J.A.) Vol. II at 24–33. Finding it to be in accordance with the statute and not arbitrary or capricious, *see UAW I*, 584 F.2d at 396 n.26, we affirm the Secretary's action.

On remand petitioner UAW submitted to the Secretary a statement of its position concerning "an appropriate subdivision." J.A. Vol. II at 10–23. Its position is that all the plants of a manufacturer devoted to production of a particular class of car, such as "subcompacts," should constitute "an appropriate subdivision." The Secretary, on the other hand, has reaffirmed his prior finding that a plant-by-plant, rather than the industry-wide, approach provides a more "appropriate subdivision" fully satisfying the requirements and the purposes of the Trade Act of 1974. This is so because, the Secretary found, the effect of imports and other factors differs from plant to plant: it is only by focusing on the individual plant that the Secretary can determine which workers are entitled to assistance under the Act by reason of their having been adversely affected by import competition. Adoption of the union's argument—that all the manufacturer's plants producing the import-affected model should be treated as the appropriate subdivision—would, in the Secretary's view, result in payments to workers in some plants who are unemployed for a variety of reasons not related to import competition.[3]

---

such total or partial separation, or threat thereof, and to such decline in sales or production.

For purposes of paragraph (3), the term "contributed importantly" means a cause which is important but not necessarily more important than any other cause.

2. A Memorandum of Recommendation of the Office of Trade Adjustment Assistance dated March 26, 1979, was adopted by the Secretary as "a full clarification of the Department's reasons concerning the determination of 'an appropriate subdivision.'"

3. The Memorandum of Recommendation, *supra* note 2, explains why a plant-by-plant approach may be consistent with Congress' intent under certain circumstances:

> The Trade Act of 1974 provides the Secretary with broad discretion to establish the appropriate subdivision, *i. e.*, the Act provides that the certification may cover a firm or an appropriate subdivision of a firm. It is consistent with the remedial purposes of the Act that this discretion should be utilized to seek out specific import-impact situations within a firm, even though certification would not be warranted if only firm experience in total was subject to import-impact analysis. It would be inconsistent with the purpose of the Act to cover a larger subdivision based on facts clearly confined to discrete and smaller subdivisions.

> Congress did not intend the Secretary to ignore the economic complexities present in any given displacement situation that included import competition. The fact of an increase in imports *per se* is not a sufficient basis for certification even though a firm or a firm's subdivision also experienced absolute declines in sales or production and significant unemployment. The Senate Finance Committee Report specifically addressed the problem of interacting economic factors present in an unemployment situation along with import competition in stating that "total or partial separations that would have occurred regardless of the level of imports, *e. g.*, those resulting from domestic competition, seasonal, cyclical, or technological factors are not intended to be covered by the program." [S.Rep.No. 1298, 93d Cong., 2d Sess. 133 (1974), *reprinted in* [1974] U.S. Code Cong. & Ad.News, pp. 7186, 7275.] Congressional guidance on how "contributed importantly" is to be interpreted and applied governs the Secretary's approach in determining the appropriate subdivision in any given case. The Secretary has to consider seasonal, cyclical, and technological impacts on employment and other factors which may be "dominant" causes of unemployment. All of these may impact differently on different firms and/or segments of a firm.

J.A. Vol. II at 27–28.

■ In our prior opinion, we stated: "It is the Secretary's function to choose a subdivision that best effectuates the purposes of the Trade Act in light of the circumstances of the individual case." *UAW I*, 584 F.2d at 397. Now that his reasons for choosing the plant-by-plant approach in this case are in the record, we are satisfied that he has faithfully complied with the mandate of our prior opinion. Granted the remedial nature of the legislation, the Secretary was still correct in concluding that Congress did not intend to bestow worker adjustment assistance to a group of employees who were separated for causes other than, or far predominating over, added import competition.

In *United Glass & Ceramic Workers v. Marshall*, 584 F.2d 398 (D.C.Cir.1978), decided the same day as *UAW I* and also involving a section 222 determination by the Secretary, this court made that very point. Although noting that Congress clearly intended to make worker adjustment assistance more readily available under the Trade Act of 1974, the court also emphasized Congress' intent that employees who would have been separated regardless of added competition are not to be covered by the program. 584 F.2d at 400. In addition to quoting the identical portion of the pertinent Senate committee report that is relied on by the Secretary here, *see* note 3 *supra*, the court cited the following statement by Peter J. Brennan, then Secretary of Labor, at Senate hearings on the then-pending legislation:

Under the revised procedures of H.R. 10710 [the bill that became the Trade Act of 1974], it is not our intention to provide trade adjustment assistance to workers whose unemployment, or underemployment, is clearly the result of normal seasonal or cyclical factors, or of shifts in technology or of domestic competition. Our regular unemployment insurance and manpower programs are designed to deal with such displacement problems.

584 F.2d at 400 n.7 (brackets in original), *quoting The Trade Act of 1973: Hearings on H.R. 10710 Before the Senate Comm. on Finance*, 93d Cong., 2d Sess., pt. 2, at 396 (1974).

■ In the instant case, the Secretary's investigations showed that the impact of increased sales of foreign standard (full size) and subcompact automobiles during the relevant period varied from plant to plant.[4] Finding that some plants actually experienced an increase in the production of the import-affected models while suffering a decline in the production of other models, the Secretary determined that import competition had not "contributed importantly" to layoffs at those plants. Nothing presented by the UAW brings the Secretary's determination into question.[5] Thus,

---

4. The actual facility-by-facility investigation revealed that company decisions to cope with changing demand for automotive products had affected assembly plant establishments and auxillary units differently. It was readily apparent from establishment data that, notwithstanding general overall declines in auto production attributable to the recession, some establishments of Ford and General Motors were directly impacted by company decisions to source a greater proportion of certain cars from Canadian facilities.

In the context of events causing declining production at certain facilities, company decisions to consolidate production at chosen locations resulted, in some instances, in actual production increases of certain import-impacted makes of autos and of related establishment employment. Further, establishments experiencing production increases of autos because of decisions to consolidate production also produced other automotive products not importantly impacted by imports, the output of which had declined. J.A. Vol. II at 29. Since there is substantial evidence supporting the Secretary's findings of fact, we are bound to accept them as conclusive. 19 U.S.C. § 2322(b) (1976).

5. The UAW argues that its industry-wide approach to "an appropriate subdivision" would not confer a windfall to undeserving workers. That simply is not true on the factual record before the court. For instance, the Secretary found that at the Wilmington, Delaware, assembly plant, production of import-impacted Chevrolets increased by more than 32,000 cars while production of non-import-impacted Buicks decreased by over 38,000 cars. To award worker adjustment assistance to employees separated from the Wilmington plant at that time would, under the circumstances, go beyond the scope of the Trade Act and the congressional intent embodied therein.

in choosing individual plants as the "appropriate subdivision" in this case, the Secretary has properly assured that worker adjustment assistance will go to those workers whom Congress intended should be its recipients. Under the circumstances, we find the Secretary's decision is in conformance with the letter and spirit of section 222.

*Affirmed.*