Priscilla BELLAND, et al., Appellants

v.

**PENSION BENEFIT GUARANTY COR-PORATION, a Federal body, et al.**

No. 83–1079.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 28, 1983.

Decided Feb. 3, 1984.

James R. Treese, Alexandria, Va., for appellants.

Eugene B. Granof, Washington, D.C., for appellee Georgia Pacific Corp.

Paul E. Freehling, Chicago, Ill., with whom John D. Heckert, Washington, D.C., was on brief, for appellee Brown Co.

James N. Dulcan, Washington, D.C., for appellee Pension Ben. Guar. Corp.

Leonard Appel, Washington, D.C., entered an appearance for appellee United Paperworkers International Union.

Before TAMM, WALD and STARR, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

Opinion dissenting in part filed by Circuit Judge WALD.

TAMM, Circuit Judge:

On May 7, 1979, appellants brought this action in district court seeking to recover certain pension benefits. Appellants alleged that the federal agency, Pension Benefit Guaranty Corporation (PBGC), was arbitrary and capricious in deciding that their pension plan was not eligible for federal insurance coverage under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1461(b)(2) (Supp. V 1981). They also alleged that their former employers, Brown Company (Brown) and Georgia-Pacific Corporation (Georgia-Pacific), breached contractual promises by reducing appellants' pension benefits.

United States District Judge Norma Holloway Johnson entered judgments in favor of PBGC, Brown, and Georgia-Pacific. *Belland v. PBGC*, No. 79–1248 (D.D.C. June 30, 1981 & Dec. 30, 1982). Appellants challenge those judgments on appeal. For reasons expressed herein, we affirm.

I. BACKGROUND

A. *The Reduction of Pension Benefits*

Appellants comprise about 253 individuals who, until the summer of 1971, were employees of Brown at a paper products man-

ufacturing plant in Portage, Michigan. Joint Appendix (J.A.) at 911. In June 1971, Brown sold the Portage plant to Georgia-Pacific. Appellants remained at the Portage plant and became Georgia-Pacific employees.

While working for Brown, appellants had participated in the Brown Company Pension Plan No. 1 (Brown Pension Plan). Because appellants, upon becoming Georgia-Pacific employees, would no longer accrue benefits under the Brown Pension Plan, the two companies provided for appellants' pensions in the purchase and sale agreement for the Portage plant. In article 7(b)(i) of the agreement, Georgia-Pacific agreed to enter into collective bargaining with appellants' representatives to substitute for the Brown Pension Plan either a new or an existing Georgia-Pacific plan.[1] In article 7(b)(ii), Georgia-Pacific promised to strive during collective bargaining to obtain retirement benefits for appellants comparable to benefits provided by the Brown Pension Plan. In article 7(b)(iii), Brown agreed to transfer to Georgia-Pacific appellants' pro rata share of money in the Brown Pension Plan, and Georgia-Pacific agreed to apply this transferred money to appellants' new pension plan.

Georgia-Pacific entered into a collective bargaining agreement with appellants in June 1971. J.A. at 1088–89. The agreement provided that appellants would participate in the Georgia-Pacific Midwestern Joint Pension Trust (Georgia-Pacific Pension Plan), which provided benefits comparable to the Brown Pension Plan.[2] Id. at 926 n. *. In February 1972, the parties amended the Georgia-Pacific Pension Plan to make benefit reductions mandatory when fund assets became insufficient.[3]

In March 1974, Georgia-Pacific announced that the Portage plant would be closed by June 30, 1974. J.A. at 593. By June 30, 1974, all production at the plant had ceased, and only two employees remained. Id. These two employees were terminated after completing plant closure between July 1 and July 3, 1974. Id. at 33, 593.

With plant closure came the cessation of contributions to the Georgia-Pacific Pension

1. Article 7(b) of the agreement provided in pertinent part:

   b) Hourly Employees:
   (i) Buyer [Georgia-Pacific] agrees to enter into collective bargaining with the representatives of the employees of Seller [Brown] in the bargaining unit at Plant 11 [Portage plant] who become employees of Buyer for the purpose of substituting for Brown Company Pension Plan No. 1 either a mutually agreed upon separate plan applicable to said employees or participation by them in the Georgia-Pacific Midwestern Joint Pension Trust.
   (ii) It shall be the goal of collective bargaining on the subject of pensions with respect to said employees that they shall receive benefits at retirement comparable to those they would have received had they remained covered by Brown Company Pension Plan No. 1 as it existed on the effective date of transfer of their employment from Seller to Buyer except as changes may be mutually agreed upon between Buyer and the collective bargaining representatives of said employees.
   (iii) As soon as reasonably practicable, Seller shall cause the pro rata share of the monies currently in the Trust Fund for Brown Company Pension Plan No. 1 alloca-

ble to said employees to be transferred to such plan as may be agreed upon in such collective bargaining for the benefit of said employees.
Joint Appendix (J.A.) at 1209.

2. Whereas the Brown Pension Plan calculated pension benefits on the basis of $5 per month per year of service, the Georgia-Pacific Pension Plan calculated pension benefits on the basis of $6 per month per year of service. J.A. at 912.

3. The February 1972 amendment mandated uniform benefit reductions:

   If, on any valuation date, it is determined by the actuary that the [Georgia-Pacific Pension Plan] . . . is not funded on an actuarially sound basis, or contributions by an employer allocated to funding its minimum benefits are permanently discontinued while such account is less than fully funded, . . . the minimum benefits thereafter payable to any employee, . . . whether or not theretofore retired, shall forthwith be permanently adjusted to a fraction of the minimum benefit otherwise determined . . . and no further contributions by the employer allocated to funding minimum benefits under said Exhibit shall thereafter be required.
   J.A. at 1154–55.

Plan. The pension plan trustees determined that existing pension plan assets would not be sufficient to pay appellants the amount provided by the plan. Accordingly, in compliance with the plan, *supra* note 3, the trustees in March 1975 reduced appellants' pension benefits from six dollars per month per year of service to one dollar and fifty cents per month per year of service. J.A. at 912. Appellants received immediate written notification of the pension benefit reduction. *Id.* at 917.

### B. *Appellants Apply to PBGC for Pension Plan Insurance Coverage Under ERISA*

Congress established PBGC on September 2, 1974 to administer the pension plan insurance provisions of ERISA. 29 U.S.C. § 1302 (1976). ERISA provides a comprehensive insurance program for certain pension plans that terminated on or after September 2, 1974. *Id.* § 1461(a). ERISA also provides retroactive insurance coverage for certain pension plans that terminated between July 1 and September 1, 1974. *Id.* § 1461(b). This retroactive coverage period commonly is called the "window period." Congress expressly tasked PBGC with determining whether a plan seeking window period coverage terminated during the window period. *Id.* Congress established two tests for making this determination: PBGC "shall make the determination on the basis of the date on which benefits ceased to accrue [the "ceased to accrue" test] or on any other reasonable basis consistent with the purposes of this subsection [the "other reasonable basis" test]." *Id.*

On September 13, 1974, appellants applied to PBGC for pension plan insurance coverage under the window period provision of ERISA. J.A. at 593. PBGC applied the "other reasonable basis" test and, based upon the *de minimis* participation by appellants in the plan after June 30, 1974, concluded that the plan terminated before July 1, 1974. Accordingly, in June 1975, PBGC notified appellants that the Georgia-Pacific Pension Plan was not eligible for window period coverage. *Id.*

In December 1975 and June 1976, PBGC reviewed its decision that appellants' pension plan terminated before July 1, 1974. J.A. at 593. Appellants, assisted by their union and by Georgia-Pacific, submitted additional factual materials to PBGC. *Id.* at 55, 65, 68. PBGC nevertheless affirmed its earlier decision. *Id.* at 593. In October 1977, PBGC determined the case should not be reopened. *Id.* at 131.

### C. *The District Court Decision*

On May 7, 1979, appellants filed the instant action against PBGC, Brown, and Georgia-Pacific. Appellants alleged that PBGC improperly denied window period pension coverage under ERISA. Appellants argued that PBGC was arbitrary and capricious in its interpretation and application of section 1461(b). J.A. at 593–94. Alternatively, appellants argued that PBGC violated the Administrative Procedure Act, 5 U.S.C. §§ 551–559 (1982), because it failed to promulgate rules governing the eligibility of pension plans seeking window period coverage. J.A. at 594. On June 30, 1981, the district court entered summary judgment for PBGC. *Belland v. PBGC,* Civ. No. 79–1248 (D.D.C. June 30, 1981).

In their complaint against Brown and Georgia-Pacific, appellants alleged that both companies breached oral promises that appellants would receive pension benefits of six dollars per month per year of service. J.A. at 914. Appellants also argued that Brown and Georgia-Pacific breached the purchase and sale agreement for the Portage plant by allowing the substantial reduction of pension benefits. *Id.* On December 30, 1982, the district court entered summary judgment for Brown and Georgia-Pacific. *Belland v. PBGC,* Civ. No. 79–1248 (D.D.C. Dec. 30, 1982).

This appeal followed.

## II. ANALYSIS

### A. *Appellants' Claims Against PBGC*

#### 1. PBGC's Interpretation of Section 1461(b)

Appellants contend that PBGC's decision to deny insurance coverage based exclusive-

ly on its application of the "other reasonable basis" test was arbitrary, capricious, and an abuse of discretion. Appellants stress that the purpose of ERISA is to provide relief for employees who otherwise would lose their pension benefits. In light of the remedial purpose underlying ERISA, appellants argue that section 1461(b) must be construed to provide expansive relief. Appellants therefore contend that section 1461(b) requires PBGC to apply the "ceased to accrue" test and allow window period coverage when, as here, *any* pension benefits accrued during the window period. If no pension benefits accrued during the window period, appellants contend that PBGC still has discretion to extend coverage pursuant to the "other reasonable basis" test. Because PBGC allegedly ignored the "ceased to accrue" test and relied exclusively on the "other reasonable basis" test, appellants argue that PBGC was arbitrary and capricious in its interpretation of section 1461(b).

■ We are not persuaded by appellants' argument. PBGC's interpretation of ERISA is entitled to great deference. *See United Steelworkers of America v. Harris & Sons Steel Co.,* 706 F.2d 1289, 1296 (3d Cir.1983); *Concord Control, Inc. v. International Union, UAW,* 647 F.2d 701, 704 (6th Cir.), *cert. denied,* 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981); *Connolly v. PBGC,* 581 F.2d 729, 730 (9th Cir.1978), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979). We do not rely solely on great deference here, however, because PBGC's interpretation of section 1461(b) was consistent with the plain language of ERISA.

Our starting point for determining whether PBGC properly interpreted section 1461(b) is, of course, the language of the statute itself. *See March v. United States,* 506 F.2d 1306, 1313 & n. 26 (D.C.Cir.1974). If the statutory language "is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion." *Id.* at 1313 (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). Section 1461(b) is phrased unambiguously in the disjunctive. PBGC is authorized to determine whether the Georgia-Pacific Pension Plan terminated during the window period "on the basis of the date on which benefits ceased to accrue *or* on any other reasonable basis consistent with the purposes of this subsection." 29 U.S.C. § 1461(b) (emphasis added). The statute clearly accords to PBGC the discretion to use the "other reasonable basis" test so long as the test is consistent with the purposes of section 1461(b).

PBGC's use of the "other reasonable basis" test here was consistent with the purposes of section 1461(b). An obvious purpose of this section is to provide insurance coverage retroactively for eligible pension plans. Another purpose, however, is to promote low insurance premiums.[4] Although Congress was concerned in ERISA with protecting employees' expectations of pension benefits, Congress also realized that employers would neither create nor maintain pension plans if ERISA imposed too much cost. "Consequently, the entire statute is a finely tuned balance between protecting pension benefits for employees while limiting the cost to employers." *A–T–O, Inc. v. PBGC,* 634 F.2d 1013, 1021 (6th Cir.1980). Because PBGC's use of the "other reasonable basis" test here was consistent with maintaining insurance premium rates at the lowest practicable level, PBGC complied with the plain meaning of section 1461(b).[5]

---

4. ERISA provides in pertinent part: "The purposes of this subchapter, which are to be carried out by [PBGC], are ... to maintain premiums established by [PBGC] ... at the lowest level consistent with carrying out its obligations under this subchapter." 29 U.S.C. § 1302(a)(3).

5. Congress intended the pension plan insurance program to become self-financing. *A–T–O, Inc. v. PBGC,* 634 F.2d 1013, 1021, 1023, 1025 (6th Cir.1980). Although PBGC is authorized to borrow money from the United States Treasury, 29 U.S.C. § 1305(c), the insurance program ultimately will be financed by premiums paid by covered plans. *Id.* § 1306(a)(1)

■ We are mindful of the principle that remedial statutes are to be liberally construed to effectuate their purpose. *See International Union, UAW v. Marshall,* 584 F.2d 390, 396 (D.C.Cir.1978). That principle, however, "does not give the judiciary license, in interpreting a provision, to disregard entirely the plain meaning of the words used by Congress." *Symons v. Chrysler Corp. Loan Guarantee Board,* 670 F.2d 238, 241 (D.C.Cir.1981). If Congress had intended that PBGC always use the "ceased to accrue" test in making window period coverage decisions, that intention would be manifest in the statutory language.[6] We find no evidence that section 1461(b) requires PBGC to use the "ceased to accrue" test when deciding the eligibility of pension plans seeking window period coverage. Instead, section 1461(b) gives PBGC discretion to use the "other reasonable basis" test so long as PBGC adheres to the purposes of section 1461(b). Here, PBGC adhered to an express statutory purpose and complied with the statute's plain language. We therefore reject appellants' argument that PBGC's decision to use the "other reasonable basis" test was arbitrary, capricious, and an abuse of discretion.[7]

2. PBGC's Decision that the Georgia-Pacific Pension Plan Terminated Before July 1, 1974

■ PBGC decided, pursuant to its application of the "other reasonable basis" test, that the Georgia-Pacific Pension Plan terminated before July 1, 1974. Appellants contend that this decision was arbitrary and capricious. Appellants emphasize that two Portage plant employees worked in the plant and accrued pension benefits from July 1 to July 4, 1974. Twelve employees received vacation pay after July 1, 1974 for vacation time earned before that date. Nine employees received "shortage accrued vacation pay" after July 1, 1974.[8] Appellants argue that these events demonstrate that the plan did not terminate before July 1, 1974.

Our standard of review is governed by the Administrative Procedure Act, which requires us

to strike "agency action, findings and conclusions" that we find to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ...." This standard of review ... presumes agency action to be valid. Moreover, it forbids the court's substituting its judgment for that of the agency, and requires affirmance if a rational basis exists for the agency's decision.

*Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 34 (D.C.Cir.1976) (en banc) (quoting Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (citations and footnotes omitted). In applying this standard, we must consider whether PBGC's determination that the pension plan termi-

("[PBGC] shall prescribe such insurance premium rates ... as may be necessary to provide sufficient revenue to the fund for [PBGC] to carry out its functions under this subchapter.").

6. Application of the plain meaning rule does not preclude consideration of persuasive legislative history. *March v. United States,* 506 F.2d 1306, 1313–14 & n. 29 (D.C.Cir.1974). Legislative history, however, does not support appellants' contention that PBGC must adhere inflexibly to the "ceased to accrue" test.

7. We also reject appellants' argument that PBGC's selection of the "other reasonable basis" test violated a rule of statutory construction by effectively excising from ERISA the "ceased to accrue" test. This argument ignores that section 1461(b) on its face gives PBGC discretion to use either test. Moreover,

PBGC did not ignore the "ceased to accrue" test. PBGC used several "ceased to accrue" criteria in its application of the "other reasonable basis" test. *See infra* p. 845.

8. Shortage pay represents erroneously unpaid earned wages. Although nothing in the Administrative Record established that employees received shortage pay after July 1, 1974, the district court considered this fact when it granted summary judgment to PBGC. J.A. at 593.

Twelve employees also received holiday pay for July 4, 1974. We note, however, that they may have been ineligible for such pay because they did not work in July 1974. Appellants' collective bargaining agreement provided holiday pay only to employees who were on active payroll during all or part of the week during which a holiday fell. J.A. at 241.

nated before the window period "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)).

PBGC considered the following factors in determining that the Georgia-Pacific Pension Plan terminated before July 1, 1974: (1) the date of termination set by the Plan Administrator, (2) the number of participants for whom benefits continued to accrue and the length of time over which those benefits accrued, (3) the date work terminated for the participants, (4) the date employer contributions ceased,* (5) the type of work performed for which pension benefits accrued, and (6) the accrual of holiday or vacation benefits. J.A. at 596–97. We find these factors are eminently relevant to a determination of when the pension plan terminated.[9]

In applying these factors,[10] PBGC found that the pension plan terminated before the window period based on the *de minimis* participation by appellants in the plan after June 30, 1974. The facts revealed that Georgia-Pacific announced in March 1974 that the Portage plant would close by June 30, 1974; the plant ceased production operations in June 1974; all but two employees were terminated by June 30, 1974; these two employees worked only three days in July, and their work consisted entirely of plant shutdown operations; except for these two employees, Georgia-Pacific made neither contributions to the pension plan

nor vacation payments to appellants for work performed after June 30, 1974. J.A. at 29, 106, 593. In light of these facts, we cannot say that PBGC committed a clear error of judgment in deciding that the plan terminated before the window period. Accordingly, we find that PBGC was not arbitrary and capricious in deciding that the plan terminated before July 1, 1974.

### 3. PBGC's Case-by-Case Method for Determining Period Coverage

Appellants contend that PBGC abused its discretion in failing to promulgate rules governing the eligibility of pension plans seeking window period coverage. Relying on *SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947), appellants aver that agencies are restricted in their ability to make case-by-case determinations to one of three situations: (1) where the agency must solve a problem that it could not reasonably foresee; (2) where the agency has insufficient experience with a problem to warrant rigidifying its tentative judgment into a rule; and (3) where the problem is so specialized that it cannot be captured within the boundaries of a rule. Brief for Appellants at 49–50. Appellants assert that the instant case fits none of these situations, and therefore PBGC was arbitrary and capricious in its failure to promulgate rules.[11]

■ Although an agency is not unfettered in its choice of whether to proceed by general rule or by case-by-case determination, that "choice ... is one that lies primarily in the informed discretion of the administrative agency." *Chenery,* 332 U.S.

---

**9.** PBGC views pension plan termination as a process rather than a discrete incident because termination typically occurs over a number of months and encompasses a number of events. Accordingly, when applying the "other reasonable basis" test, PBGC determines whether a plan has terminated based on the specific facts and circumstances underlying the activities of the pension plan participants. We do not find this approach to be an abuse of discretion.

**10.** No party disputes the adequacy of PBGC's factfinding procedures in this case. Prior to its June 1975 decision, PBGC accorded all parties

the opportunity to submit relevant information. Moreover, notwithstanding its June 1975 decision, PBGC continued thereafter for more than two years to seek and consider information from the parties.

**11.** ERISA established a cut-off date of October 31, 1974 for filing window period claims. 29 U.S.C. § 1461(b)(4). Because PBGC was dealing with a finite number of claims filed in a short period of time, appellants contend that PBGC knew the parameters of the problem with which it was dealing and therefore was bound by *Chenery* to promulgate rules.

at 203, 67 S.Ct. at 1580. We believe that PBGC was justified in choosing a case-by-case approach for window period determinations.

■ PBGC came into existence on September 2, 1974 charged with the responsibility of administering a complex and novel pension plan insurance program. One of PBGC's challenges was the task of processing window period claims. Because the filing of window period claims was limited to the two-month period between September 2 and October 31, 1974, 29 U.S.C. § 1461(b)(4), only about 200 claims were filed. PBGC chose to process this finite number of claims on a case-by-case basis. In view of the limited utility of a window period regulation, the demand for immediate disposition of window period claims, and the fact that appellants were afforded ample opportunity to present information to PBGC concerning their claim, we find that PBGC did not abuse its discretion in choosing to make window period decisions on a case-by-case basis. See generally A–T–O, Inc. v. PBGC, 634 F.2d 1013, 1023–24 (6th Cir.1980).

B. *Appellants' Claims Against Brown and Georgia-Pacific*

1. The Companies' Alleged Oral Promises

Appellants contend that the district court erred in finding that their cause of action against Brown and Georgia-Pacific for breach of oral promises was barred by the applicable three-year statute of limitations.[12] Appellants argue that the complaint they filed in May 1979 was timely because the cause of action accrued on one of three dates: 1) in October 1977, when PBGC conclusively denied appellants' window period claim; 2) in July 1977, when the trustees of the Georgia-Pacific Pension Plan purchased the annuity which would pay reduced pension benefits; or 3) in July 1978, when the litigation between Georgia-Pacific and Brown for appellants' pro rata share from the Brown Pension Plan was resolved.[13]

■ It is well established that the statute of limitations for breach of an oral promise begins to run from the time of the breach. See Hoffa v. Fitzsimmons, 499 F.Supp. 357, 366 n. 39 (D.D.C.1980), remanded on other grounds, 673 F.2d 1345 (D.C.Cir.1982). Contrary to appellants' assertion, the companies' oral promises, if they exist at all, were breached no later than April 1975. By April 1975, the trustees of the Georgia-Pacific Pension Plan had notified appellants of the decision to reduce appellants' pension benefits. Appellants could then have sued the companies for breach of oral promise. Because appellants waited until May 1979 to file their complaint, they are barred by the three-year statute of limitations. See Oppenheim v. Campbell, 571 F.2d 660, 662 (D.C.Cir. 1978) (litigant's action accrues when his right to resort to court is perfected).

The alternative dates asserted by appellants must be rejected. As the district court noted:

[Appellants] advance the untenable legal position that a statute of limitations on one claim does not run until [appellants] exhaust all other potential claims that could eliminate their alleged loss. That argument must be rejected because it would allow plaintiffs to determine when various statutes of limitations commence dependent upon the legal theories they

---

12. Appellants concede that the applicable statute of limitations is three years. J.A. at 917. Appellants challenge the district court's finding that the breach occurred no later than April 1975.

13. Under the terms of the purchase and sale agreement for the Portage plant, Brown was obligated to deliver to Georgia-Pacific appellants' pro rata share of the money in the Brown Pension Plan. See supra note 1. In 1972, Georgia-Pacific brought suit alleging that Brown had failed to deliver appellants' pro rata share of the money. The court found Brown liable for approximately $60,000. Georgia-Pacific Corp. v. Brown Co., No. K 18–72 (W.D. Mich., Mar. 21, 1978), aff'd, 636 F.2d 1217 (6th Cir.1980). Georgia-Pacific deposited the money it recovered from Brown in the Georgia-Pacific Pension Plan. J.A. at 912.

choose to advance at a particular time. Statutes of limitations must remain objective standards that are triggered as soon as litigants' rights have been breached.

J.A. at 918–A to 919 (footnote omitted). Appellants' alleged rights were breached no later than April 1975. Accordingly, appellants are barred by the statute of limitations in their claim against the companies for breach of oral promises.[14]

2. Alleged Contractual Guarantees Arising From the Purchase and Sale Agreement

■ Appellants contend that the district court erred in finding they have no contractual rights under the purchase and sale agreement. Appellants argue that they are third party beneficiaries of the agreement, and that both companies guaranteed in article 7(b) that the benefits under the Georgia-Pacific Pension Plan would be equal to or better than those under the Brown Pension Plan.

Assuming, but not holding, that appellants are third party beneficiaries,[15] we agree with the district court that article 7(b) of "the agreement provides no support for an express or implied promise by either Brown or [Georgia-Pacific] to guarantee [appellants'] pension funds." J.A. at 916.

Articles 7(b)(i) and (ii) require Georgia-Pacific to bargain collectively with appellants on the subject of pensions, and to establish as a "goal" pension benefits for appellants "comparable" to those appellants would have received under the Brown Pension Plan. *Supra* note 1. Setting a "goal" of achieving "comparable" benefits in collective bargaining does not constitute a binding promise that such benefits will be achieved.[16] Moreover, and more importantly, Georgia-Pacific fully complied with articles 7(b)(i) and (ii) when it entered into a collective bargaining agreement that provided pension benefits that were at least "comparable" to those provided by Brown.[17]

Similarly, we find no basis for a contractual claim based on article 7(b)(iii) of the agreement. Under that provision, Brown agreed to transfer to Georgia-Pacific appellants' pro rata share of money in the Brown Pension Plan, and Georgia-Pacific agreed to apply this money to appellants' new pension plan. *Supra* note 1. Both companies fully complied with this provision. Moreover, any claim that Brown transferred an inadequate amount of money to Georgia-Pacific has been fully adjudicated. *See supra* note 13. Accordingly, appellants may not now assert contractual rights under article 7(b) of the agreement.[18]

14. The district court held that appellants' claim for breach of oral promises also is barred both by the Georgia-Pacific collective bargaining agreement and by appellants' failure to present a sufficient claim for promissory estoppel or unjust enrichment to withstand summary judgment. Because we hold that appellants' claim is barred by the statute of limitations, we need not address the merits of these other independent bars to appellants' claim.

With regard to appellants' assertion that the companies should be estopped from asserting a statute of limitations defense, we find no support in the record that the companies made any statement or engaged in any conduct that tended to lull appellants into inaction. *See Emersons Ltd. v. Max Wolman Co.,* 388 F.Supp. 729, 732 (D.D.C.1975), *aff'd,* 530 F.2d 1093 (D.C.Cir. 1976). Georgia-Pacific's suit against Brown to recover appellants' pro rata share of the Brown Pension Plan was no indication that appellants should wait to file suit on an entirely unrelated claim. Similarly, Georgia-Pacific's efforts on appellants' behalf to obtain window period coverage for the Georgia-Pacific Pension Plan

should not have lulled appellants into inaction, but should have alerted them to Georgia-Pacific's position that it had no legal obligation to guarantee appellants' pension benefits.

15. The district court found that appellants were not third party beneficiaries of the agreement. J.A. at 915.

16. Indeed, even the "goal" of comparable benefits was circumscribed by the following qualifying language: "except as changes may be mutually agreed upon between [Georgia-Pacific] and [appellants' representatives]." *Supra* note 1.

17. Significantly, the district court stated that the Georgia-Pacific Pension Plan "appeared to be a superior pension program to the Brown program ...." J.A. at 926 n. *.

18. Appellants also assert that the district court erred in granting summary judgment in favor of Brown and Georgia-Pacific. We hold that the companies were entitled to summary judg-

### III. CONCLUSION

For the reasons stated, we affirm the district court's judgments for PBGC, Brown, and Georgia-Pacific.

*Affirmed.*

WALD, Circuit Judge, dissenting in part:

Over 250 people, many of whom had worked in the same factory for several decades, had their monthly pension payments cut by seventy-five percent—from $6.00 to $1.50 per month for each year of service—when their employer shut down the plant at which they were employed. They brought a claim under the Employee Retirement Income Security Act (ERISA), a statute that was passed in order to avoid precisely the kind of tragedy recounted here. Although there is no question that the Pension Benefit Guaranty Corporation (PBGC) was statutorily authorized to extend coverage to the appellants, it rejected their claims. The majority upholds the PBGC's decision as a reasonable exercise of its discretion under the statute. Because I believe that the PBGC did not, as it was required to do, construe the statute in light of its resounding remedial purpose, I dissent from the majority's decision upholding the district court's grant of summary judgment to the PBGC. I would remand to the district court to require the PBGC to give a persuasive explanation as to why its stingy construction of the statute comports with Congress' explicitly generous purpose in making ERISA's federal guarantees retroactively apply to plans terminated within the two months before the Act was passed.

As the Supreme Court has recognized, "[o]ne of Congress' central purposes in enacting this complex legislation was to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated." *Nachman Corp. v. PBGC,* 446 U.S. 359, 374–375, 100 S.Ct. 1723, 1732–1733, 64 L.Ed.2d 354 (1980) (footnote omitted).[1] The most telling expression of ERISA's broad remedial purpose was the extraordinary provision before us, retroactively guaranteeing the pension benefits of employees whose pension plans terminated as early as July 1, 1974, over two months before ERISA was enacted. "In order to provide prompt and effective protection for the employees concerned,"[2] Congress decided "to afford the [PBGC] emergency authority to institute insurance protection on a 'crash' basis,"[3] well before it could put into effect ERISA's provisions for employer liability, reporting and other measures aimed at protecting the PBGC's financial integrity. As Senator Williams, chairman of the conference committee, explained to his colleagues, "[t]his was done in recognition of the fact that depressed economic conditions in certain regions created the possibility that a number of plans were in critical straits and were terminating or were likely to do so imminently."[4] The addition of such "window period" coverage demonstrates an inclination to come down on the side of generosity toward workers whose expectation of adequate retirement income has been devastated, casting a long and threatening shadow over their later years.

The statute provides that the PBGC *shall* pay benefits for certain plans that termi-

---

ment because no genuine issues of material fact existed. *See National Ass'n of Gov't Employees v. Campbell,* 593 F.2d 1023, 1027 (D.C. Cir.1978).

1. The legislative history, *reprinted in* Subcomm. on Labor, Senate Comm. on Labor and Public Welfare, 94th Cong., 2d Sess., *Legislative History of the Employee Retirement Income Security Act of 1974* (1976) [hereinafter cited as "Legislative History"], is replete with tragic stories like that before us. *See, e.g.,* 3 Legislative History at 4665 (statement of Rep. Thompson); *id.* at 4694 (remarks of Rep.

Brademas); *id.* at 4712–13 (remarks of Rep. Ford); *id.* at 4716–17 (remarks of Rep. Daniels); *id.* at 4749–50 (remarks of Sen. Javits); *id.* at 4792–94 (remarks of Sen. Bentsen).

2. *Id.* at 4678 (statement of Rep. Ullman introducing and explaining conference committee report and changes).

3. *Id.* at 4766 (remarks of Sen. Williams, conference committee chairman, explaining committee bill).

4. *Id.*

nated after June 30, 1974, and before September 2, 1974, the date of enactment, and that the PBGC shall determine whether a plan has terminated within the two month period "on the basis of the date on which benefits ceased to accrue or on any other reasonable basis consistent with the purposes of this subsection." 29 U.S.C. § 1461(b). One member of the conference committee, which drafted the "window period" provision, explained that it would extend coverage to a plan much like that of these appellants. Representative Thompson thus recommended the bill to his colleagues in part as follows:

> In my own district, the Roebling plant of the Colorado Fuel and Iron Co. was closed June 30 thereby thrusting almost 1,400 men and women into the ranks of the unemployed. Many of these employees had 30 to 35 years of service in the plant .... Although the plant ceased operation June 30, the pension plan for those employees continues in existence. The conference substitute covers all pension plant [sic] terminations of single employer plans occurring after July 1, 1974. Inasmuch as the Roebling pension plan was not terminated prior to July 1, 1974, within the meaning of the term as used in the conference report, the plant and its employees are covered [by section 1461(b) ].[5]

Congress thus appears to have contemplated coverage under section 1461(b) of a plan for a plant in which *no* employees worked during the window period.

Even if one were to discount the significance of such remarks, however, the interpretation of ERISA "must be guided by the familiar canon of statutory construction that remedial legislation must be construed broadly to effectuate its purposes." *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). *Accord Peyton v. Rowe,* 391 U.S. 54, 65, 88 S.Ct. 1549, 1555, 20 L.Ed.2d 426 (1968); *International Union, UAW v. Marshall,* 584 F.2d 390, 396 (D.C.Cir.1978); *National Automatic Laundry & Cleaning Council v. Schultz,* 443 F.2d 689, 706 (D.C.Cir.1971). This court has

gone even further and articulated "as a reasonable corollary" of this basic doctrine the principle "that when a petitioner under a government benefits program puts forward an interpretation of a legislative provision that is arguably consonant with the statutory language, he is at least entitled to a reasoned statement why the administrator will not adopt that interpretation." *UAW v. Marshall,* 584 F.2d at 396.

In the *UAW* case we were required to determine whether the Secretary of Labor had properly construed a provision in the Trade Act of 1974, a primary purpose of which was to expand eligibility for "worker adjustment assistance" for employees displaced by increased competition from imports in their industry. Eligibility under the 1974 Act turned in part on whether increased competition from imports contributed importantly to the separation of a significant number of workers "in a firm or an appropriate subdivision thereof." In the absence of any specific legislative history behind this clause, the Secretary had determined that the largest "appropriate subdivision" for the purposes of this provision was the individual plant. The UAW had argued for larger subunits, such as all the plants involved in production of a particular car model which would have expanded eligibility. It contended that the use of "an" before "appropriate subdivision" supported its interpretation that several subdivisions were possible and that "an appropriate subdivision" need not be the most appropriate subdivision. Finding the UAW's interpretation plausible, this court remanded to the Secretary for an explanation of the circumstances that he believed *mandated* the choice of the plant as the appropriate subdivision in light of this duty "to choose a subdivision that best effectuates the purposes of the Trade Act."

The *UAW* case is an application of the familiar principle that an agency's interpretation of statutory language, which we or-

5. *Id.* at 4665.

dinarily will uphold as long as it is reasonable, must be consistent with the purpose of the legislation. Where the language at issue is part of a novel and comprehensive remedial scheme like ERISA, the *UAW* case teaches that this principle has a sharper edge to it: If a putative beneficiary advances a plausible interpretation of the statute, the agency must at least give a rational explanation why its own more restrictive interpretation is nevertheless reasonable in light of the purpose of the legislation.[6] I do not believe we have been given any satisfactory explanation by PBGC here as to why it rejected the appellants' interpretation.

The PBGC, now backed by the majority, asserts that a countervailing legislative purpose—that of ensuring the financial integrity of the insurance fund and of keeping premiums low—justifies its niggardly construction of eligibility under section 1461. I find such a generalized economic justification wholly inadequate. First, every piece of remedial legislation that involves the disbursement of money has a secondary "purpose" of not disbursing *too much* money and thus endangering the program. In the *UAW* case itself, there was surely a legislative purpose to conserve funds for those whose jobs were most clearly affected by imports. But until the agency could demonstrate that this secondary purpose was actually undermined by the petitioner's construction of the statute, it was governed instead by the overriding remedial purpose of affording coverage in cases that reasonably came within the statutory eligibility definition.

In this case, the PBGC has not attempted to demonstrate that the financial integrity of its insurance fund would be threatened or the employers' premiums affected by a decision to cover the appellants' pension benefits. Because of the unusual finite nature of "window period" claims, the PBGC concedes that a decision in favor of the appellants here would probably not affect a single other case. There are no floodgates; the window has already been closed for several years, precluding any substantial drain on ERISA's funds.

The PBGC also concedes it has the statutory authority to extend coverage to these claimants under section 1461(b), since it is undisputed that benefits ceased to "accrue" during the window period. However, enveloping itself in the comfortable cloak of agency discretion, the PBGC has decided not to apply the simple and objective test of when benefits no longer accrue but rather to determine the eligibility of all "window period" claimants solely under the second statutory criterion, "any other reasonable basis consistent with the purposes of this subsection." According to the PBGC, the statute's use of the disjunctive "or" grants it the discretion to read out of the statute the "accrual of benefits" test and to apply the "any reasonable basis" test in every case. The majority agrees.

I disagree. The PBGC's (and now the majority's) interpretation of the statute renders meaningless the first and more objective "accrual of benefits" test. This, of course, violates "[t]he cardinal principle of statutory construction [which is] to save and not to destroy . . . [and] to give effect, if possible, to every clause and word of a statute." *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955). To avoid this result, appellants read the statute as granting the PBGC the discretion under the second test to expand coverage to some who would not qualify under the "accrual of benefits" test, but not the discretion to deny coverage

---

6. This does not mean, of course, that the agency must accept the interpretation that will result in eligibility for the largest number of persons. In the *UAW* case after remand, for example, we upheld the Secretary's decision to use the individual plant as the largest appropriate subdivision after he demonstrated that any larger subdivision would result in a windfall to large numbers of workers whose jobs had not been significantly affected by competition from imports. *International Union, UAW v. Marshall,* 627 F.2d 559 (D.C.Cir.1980). The *UAW* case means simply that the reasonableness of an agency's statutory interpretation, and of its rejection of another more generous and fully plausible interpretation, must be evaluated in light of the statute's broad remedial purpose.

where it would be authorized under the first test. Such an interpretation would give effect to every clause in the statute and would be far more consistent with the remedial purpose of ERISA and section 1461(b).[7] This construction would also avoid the counterintuitive result reached by the PBGC in this case, where it concluded that a plan had terminated before benefits under the plan had "ceased to accrue."

The PBGC achieves this result by deciding that section 1461(b) coverage does not extend to plans that, according to a balancing of all the factors under the "other reasonable basis" test, have "effectively" or "substantially" terminated before the "window period." The PBGC thus appears to have read into section 1461(b) an additional stumbling block for claimants that would be unwarranted even if one accepted the PBGC's argument that it has absolute discretion to choose the "any other reasonable basis" test for deciding when a plan "terminated." Counsel for the PBGC at oral argument had difficulty saying that this plan had actually terminated before July 1, 1974, but could say only that the *process* of plan termination had gone far enough to justify its conclusion that the plan had terminated.

In support thereof the majority and the PBGC emphasize the marginal nature of the accrual of benefits within the "window period." Of course, anytime a statute sets out a clear bright line and objective criteria for placing cases on one side or another, it is almost inevitable that some cases will fall very close to the line. But it is an important virtue of clear and objective criteria that they provide a ready way to resolve those close cases. The PBGC would abandon the clear line suggested by Congress for a balancing of all the relevant factors, a method of decisionmaking that maximizes its own discretion. It would further expand its discretion by permitting exclusion of plans that have substantially terminated (but not yet actually terminated). I do not believe that the "plain language" of section 1461(b) vests so much discretion in the PBGC.

In my view, the PBGC has squeezed every last drop of agency discretion it could extract—and some it rightly couldn't—from a few words of a statutory scheme intended to remedy the disastrous consequences of pension plan collapse, and thus drowned the only hope these 250 individuals had of restoring a measure of retirement security. I cannot approve this result as a reasonable one based on a reasonable construction of section 1461(b) of ERISA. I therefore respectfully dissent.

---

**7.** Such an interpretation would also be consistent with Representative Thompson's expectation that the Roebling plan would be covered by section 1461(b). *See supra* p. 849.